**Affirmed and Opinion filed July 30, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00873-CV

---

**THE KROGER COMPANY, Appellant**

**V.**

**CHRISTOPHER MILANES, Appellee**

---

**On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 2011-44685**

---

## O P I N I O N

Appellant, The Kroger Company, a non-subscriber to workers' compensation insurance, appeals from a final judgment in favor of appellee Christopher Milanes, a Kroger employee who was seriously injured while cutting meat. In its first two issues, Kroger contends the trial court erred when it submitted Milanes's claim to the jury on a general negligence theory rather than a premises liability theory. We overrule these issues because (1) the Supreme Court

of Texas has held that a non-subscriber employer in Texas owes continuous, non-delegable duties to its employees separate and distinct from those owed to an invitee on the premises; and (2) Milanes alleged, and legally sufficient evidence showed, that Kroger breached those duties.

Kroger asserts in its third and fourth issues that the evidence is legally and factually insufficient to support the jury's findings that Kroger's negligence proximately caused Milanes's injury and that he suffered past and future loss of earning capacity as a result of the injury. We overrule these issues because the record on appeal contains legally and factually sufficient evidence of both proximate cause and loss of earning capacity.

In its fifth issue, Kroger contends that the trial court abused its discretion when it admitted irrelevant photographs and videos that it argues were taken illegally. We overrule this issue because the photographs and videos were relevant, Milanes took them while legally on Kroger's premises, and Kroger has not shown that he violated any law while doing so. Finally, Kroger argues in its sixth issue that the trial court abused its discretion when it failed to intervene to remedy alleged juror misconduct. We overrule this issue because, even if we assume the trial court had a duty to intervene and failed to do so, Kroger has not established that it was harmed as a result. We therefore affirm the trial court's judgment.

## BACKGROUND

### A.    Kroger hires Milanes and trains him as a journeyman meat cutter.

Milanes applied for a job at Kroger in 2007. Milanes went through a one-day orientation before he started work. According to Milanes, the orientation did not involve safety training but instead covered the advantages of joining the union. Once Milanes started working for Kroger, he was assigned to work in the meat

2

department as a clerk. After he had been working for about a month, Kroger promoted Milanes to apprentice meat cutter. Milanes then moved from store to store before eventually being assigned to the Post Oak Kroger in 2009.

As an apprentice meat cutter, Milanes received on-the-job training from a journeyman, or more experienced, meat cutter. Journeyman meat cutters were supposed to train apprentices on the proper operation of the store's meat-cutting equipment, including the Biro brand bone-in band saw at issue in this appeal. The journeyman meat cutter was also expected to train the apprentice in the safety measures that needed to be taken while using that equipment. Milanes eventually became a journeyman meat cutter.

Milanes testified that he received a great deal of his meat-cutting training from Matt Anderson, a journeyman meat cutter at the Kroger store in Montrose. While Milanes testified that he believed Anderson did a good job training him, he also testified that he was not taught by anyone at Kroger to use the band saw blade guard, which both the saw manufacturer and the Occupational Safety and Health Administration (OSHA) require to be used at all times while cutting meat with the saw.[1] Indeed, Milanes testified that he was not even aware that the bone-in band saw had a blade guard; instead, he was taught the blade guard was a guide used to line the meat up prior to cutting. As a result, Milanes never used the blade guard. Milanes also testified that he was never given Kroger's Meat and Seafood Department Safety Manual or the Biro band saw's operator's manual. Milanes further testified that the bone-in saw manufacturer's warning labels were not on the Post Oak Kroger's saw during the time he worked at the store.

---

[1] Milanes testified that he did not learn that the band saw was equipped with a blade guard until after his injury. Evidence showed that a meat cutter was required to keep the blade guard set to one-half inch above the level of the meat being cut at all times.

3

**B.    Problems with Kroger's bone-in band saw were reported prior to the injury.**

Milanes and other meat cutters experienced problems with the bone-in saw prior to Milanes's injury. Milanes testified that before he was injured, he reported to Kroger management: (1) the saw squealing loudly; (2) the blades dulling very quickly, often within thirty or forty minutes of the blade being changed; (3) the saw frequently catching the meat and sucking it into the blade; (4) the saw being off-balance and shaking frequently; (5) the blade wobbling; and (6) the presence of a lip on the saw table that frequently snagged the meat. Milanes testified that if he told Adam Bell, another journeyman meat cutter who also served as a relief meat market manager, about a problem, Bell would start tinkering with the saw in an effort to fix the problem. Milanes saw Bell doing maintenance on the saw at least twice a week.

With respect to the saw blade dulling quickly, Milanes admitted he had the discretion to change the blade whenever he believed it was necessary. He went on to explain, however, that Kroger management had asked the meat cutters to be sparing with the blades and to make them last. The evidence also revealed that there was a financial incentive for managers to come in under budget. Milanes recounted an episode in which he had used so many blades on the bone-in saw that the store's supply was exhausted, thereby angering management.

In addition to Milanes, several other Kroger meat cutters testified during the trial regarding the pre-accident condition of the saw and Kroger's handling of maintenance issues. These witnesses included William Quinones, Michael Barnes, and Bell. Quinones still worked as a Kroger meat cutter at the time of trial. Kroger had terminated Barnes prior to trial for alleged dishonesty. Bell, as mentioned above, was a meat cutter and assistant meat market manager at the Post

4

Oak Kroger. All three testified that there were frequent problems with the bone-in saw.

Among the problems Quinones reported to Kroger management were (1) the blade tension was not right; (2) the blade would occasionally pop off of the saw; (3) the saw table was wobbly; and (4) the blade dulled quickly, requiring frequent blade changes. According to Quinones, management could not get the problems with the saw fixed before Milanes's injury. Quinones also explained that a band saw making a loud squealing noise can indicate that there is a problem with the saw's blade tension. He went on to explain that if the tension is off, it can make the blade dull more quickly. Quinones explained that a dull blade can cause the meat to jerk or suck the operator's hand into the blade.

Like Milanes, Quinones testified that he had never seen the operator's manual for the bone-in saw and management never told him that he had to read it before operating the saw. Quinones also confirmed that there were no warning signs or labels on the bone-in saw. Quinones never observed inspectors performing regular maintenance on the saw. Instead, Kroger maintenance personnel only came out when a problem was reported. Quinones testified that he was not a trained maintenance person for the bone-in saw, but Kroger expected him to perform maintenance on the saw. Quinones admitted that he had adjusted the tension on the blade and that he had also seen Bell working on the saw.

Barnes confirmed many of the problems mentioned by Milanes and Quinones. Barnes testified that he saw Bell adjusting the tension on the blade and that Bell would grab pliers and attempt to fix any problem reported to him. Barnes also agreed with Quinones that there was no regular maintenance program for the store's band saws.

Bell testified that he experienced the blade popping off the saw prior to

5

Milanes's injury. He went on to explain that, in his experience, the blade coming off a band saw was caused by either (1) an accumulation of bone dust and "goop" clogging the blade scrapers;[2] or (2) the blade tension not being set properly. Bell also testified that when a band saw makes a loud noise, it means something is wrong with the saw. Bell further testified that he had never seen a complete list of steps on how to clean the bone-in saw nor had he seen the operator's manual for the saw.

Bell admitted that he was not certified by the saw manufacturer to do maintenance on the saw. Bell testified that, as a journeyman meat cutter, he could change the saw's blade and also adjust the tension of the blade but was not authorized to do more than that. According to Bell, he took the saw apart to clean it, not perform maintenance on it. After he was shown a photograph that appeared to show him working on the bone-in saw, Bell explained that a Kroger maintenance person had told him that there was a nut on the saw that if it became loose, it could cause the blade to get out of adjustment and possibly even pop off. Bell explained that he was attempting to adjust that nut when the photograph was taken. Bell then denied that he was doing anything improper when the photograph was taken.

Bell testified that he did not recall any particular problems with the bone-in saw prior to Milanes's injury. In Bell's opinion, there would have to be something very wrong with a band saw for the blades to dull within thirty to forty minutes of being changed. Bell went on to state that dull blades make it more likely that the meat will jump while being cut. Bell also did not recall any feedback from Kroger

---

[2] There are two sets of blade scrapers on the bone-in saw, one above the cutting table and one below. Each set consists of two pieces of metal attached to the saw housing, one on either side of the revolving blade. The blade scrapers are designed to remove from the blade material created by the cutting of the meat. Bell admitted that the blade scrapers had never been changed during his time at the Post Oak Kroger.

management about changing saw blades too frequently or any request to keep costs down by not changing the blades out as often as a meat cutter believed necessary.

## C.     Milanes is seriously injured while cutting meat with the saw.

At the time of his injury, Milanes had nearly completed his eight-hour shift. Milanes testified that even though it was the end of his shift, he was not tired and was attending to the task of cutting meat just as closely as he had been at the beginning of his shift. Milanes also testified that he had the meat seated properly on the saw table prior to the injury. Milanes observed that the blade seemed pretty dull, but he decided not to change the blade. According to Milanes, the saw was making a loud noise that evening, and the table was still wobbly. Milanes also noticed that the lip was still present on the saw table. Milanes did not report any of these problems to management that evening because he had reported them previously and the problems were not addressed.

Milanes was cutting a slab of meat into individual steaks and was about three-fourths of the way through the slab. Milanes is right-handed, and he estimated that his right hand was about six inches from the blade before the accident occurred. According to Milanes, the accident happened so fast that he did not see exactly what happened. Milanes testified that he believed the dull blade caused the meat to jump, or flip over, pulling the fingers of his right hand into the blade.

The saw blade amputated parts of three fingers from Milanes's right hand. Milanes was taken to the hospital, where he underwent surgery to reattach the severed fingers. The surgery was unsuccessful. Milanes later underwent two additional surgeries to cover exposed bone. After the surgeries, Milanes underwent extensive physical therapy and testified that he continued to experience a great deal of pain in the areas of the amputations. Milanes also testified that he

experienced the phantom sensation that his fingers were still there. At the time of trial, Milanes was still experiencing pain severe enough that he had to take pain medication frequently.

Milanes reported that the loss of his fingers had adversely impacted his ability to participate in physical activities such as rock climbing, basketball, football, dodge ball, running with his dog, and lifting weights at the gym. The injury also affected his ability to drive his standard transmission car. Milanes reported that he was unemployed at the time of trial. Milanes testified that he had tried two different jobs after he was terminated by Kroger, but he had been unsuccessful because both jobs required manual dexterity. Milanes also testified that all of his prior job experience had involved manual labor, and he could no longer do that type of work.

Milanes offered evidence that after the accident, he experienced severe anxiety, depression, insomnia, as well as nightmares about cutting off his fingers. Milanes twice went to the hospital thinking he was experiencing a heart attack. Doctors diagnosed both episodes as anxiety attacks, not heart attacks. Milanes also experienced feelings of anger because the meat department personnel had complained that the bone-in saw was not working properly prior to his injury. Milanes eventually went to see a psychologist. Once Milanes returned to work at the Post Oak Kroger, he experienced anxiety when he was around the meat saws. Milanes's psychologist recommended that he be kept away from the saws while he was working.

## D. Milanes returns to work on light duty and Kroger terminates his employment.

Milanes was earning $16.69 per hour when he was injured. He returned to work several months after the accident at that same wage. Milanes was initially

placed on light duty in the meat department when he returned to work. Milanes testified that he had no specific job duties while on light duty and frequently spent his time doing little more than talking to customers. Kroger began asking Milanes to resume cutting meat about a month after he returned to work but while he was still on light duty. Kroger made this request even though Milanes's doctors had ordered that he not be required to cut meat at that point in time. Kroger asked Milanes to return to meat cutting several times.

Milanes was to return to full duty with no restrictions on October 21, 2011. The day before, Bell, as he was leaving work, instructed Milanes to clean the meat department cooler. Milanes explained that an industrial hose and scalding hot water were used to clean the meat department cooler and saws. Milanes picked up the hose and noticed that it had a leak. Milanes also saw that a new hose was laying nearby, so he called the store manager, William Underwood, and asked if Underwood could send someone to change out the hoses. Underwood told Milanes to do it himself. Milanes testified that he responded: "[C]an we have somebody else? And he said, no. And before I could say anything else, he started yelling and saying it's not a light duty issue. Anything - - I didn't even say that. And I said, well, it is kind of a light duty issue. And he said I'll be back there in a minute." Milanes testified that he did not believe the task of changing out the hoses was within his job duties at that point in time. Milanes explained that he was still on light duty, his hand was still hurting a great deal, and changing out the hose required the person to use pliers and a wrench, tasks he did not think he should do while his hand was still hurting.

When Underwood arrived, he asked Milanes why he could not change out the hose. Milanes responded that he was not going to do it. Milanes testified that he did not want to say in front of other employees that he was physically unable to

change out the hose, but that Underwood was aware he was still on light duty. When Milanes continued to refuse to change out the hose, Underwood terminated him for insubordination. Milanes admitted that he never told Underwood in front of other people that he was physically unable to perform the task of changing out the hose.

**E.     Mechanical engineering experts testify regarding saw operation and maintenance and the cause of Milanes's injury.**

At trial, mechanical engineer John Ryan testified on behalf of Milanes. According to Ryan, OSHA standards require an employer to provide a safe workplace. OSHA also has a general machine guarding standard that requires any hazardous point of operation to be guarded. Additionally, OSHA had specific standards for the operation of band saws such as the bone-in saw at issue in this case. OSHA, according to Ryan, has three primary concerns with the operation of band saws. First, OSHA requires that each band saw have an operational blade guard. Second, OSHA emphasizes that a band saw's blade tension must be properly set. Finally, OSHA requires employers to have a training program in place so that employees learn how to operate a band saw safely. Ryan explained that blade tension is important for the safe operation of band saws because if the tension is not set correctly, the blade can pop off the saw.

Ryan obtained a copy of the operator's manual for the type of bone-in saw used at the Post Oak Kroger. The manual states that the saw's blade guard must be kept within one-half inch of the meat being cut. According to Ryan, if the blade guard is adjusted to within one-half inch of the meat, and the meat suddenly jumps or rolls, the guard will prevent the operator's hand from contacting the blade. The manual also requires that all warning labels be kept on the saw and replaced promptly if any come off. The manual also provides that if the saw is not working

properly, it should be taken out of service until it can be repaired.

Ryan inspected the bone-in saw approximately one year after Milanes's injury. Ryan discovered that most of the saw's warning labels were missing.[3] Ryan also found the blade guard inoperable. He concluded the guard was frozen in position as a result of the accumulation of either rust or "goop" generated by the sawing of meat. The blade guard finally moved when he applied fifty pounds of pressure. Ryan went on to testify that the guard remained very difficult to move even after he broke it free.

Ryan took several videos during his inspection. One video showed Bell cutting meat on the bone-in saw. Ryan observed that Bell did not use the blade guard while cutting the meat and that the guard was at least four inches above the level of the meat throughout the video.

Ryan opined that if the bone-in saw's blade guard was not operational on the day of Milanes's injury, the saw should not have been in service. Ryan then opined that if the saw had been taken out of service, Milanes would not have been injured. He went on to opine that if Kroger had followed OSHA's standards and the requirements set forth in the operator's manual, Milanes also would not have been injured.

Ryan examined the saw's blade tension during his inspection. Ryan found numerous scratch marks on the inside of the saw housing. Ryan explained that the scratch marks indicate the blade had popped off repeatedly and hit the metal housing. Ryan opined that this type of contact with the metal housing can dull the blade.

Ryan then explained that improper blade tension can also cause a wandering

---

[3] Ryan explained that he found a couple of warnings still attached to the motor.

cut. According to Ryan, when a blade is under-tensioned, it can cause the blade's cutting path to wander, which can lead to force being applied to the meat sideways. This in turn increases the possibility that the saw will bind in the meat or the bone, causing the meat to be thrown or to roll. Ryan added that this possibility increases if the blade is also dull. Ryan calculated how much force this saw would apply to an operator's hand and found it reasonable that the saw could cause the meat to roll.

Ryan next addressed the loud screeching sound the bone-in saw exhibited. Ryan opined that the noise was created by the blade rubbing at high speed against something, possibly the blade scrapers. Blade scrapers are designed to remove meat and other debris from the blade to keep the blade clean and operational. Ryan testified that if the blade is rubbing against one of the blade scrapers, it can cause the blade to dull at a faster rate than normal.

Finally, Ryan discussed Kroger's maintenance records for the bone-in saw. Ryan asked to review all maintenance records for the saw. The first maintenance record he received from Kroger was dated six days after Milanes's injury. Ryan also saw other post-injury records but he never received any maintenance records pre-dating the injury. Both Underwood, the Post Oak Kroger store manager, and the primary Kroger employee charged with maintenance on the saw, Brent Nixon, confirmed the lack of any pre-injury maintenance records for the bone-in saw. Neither could explain the lack of records.

Milanes called Kroger's mechanical engineering expert, Thomas Grubbs, to testify as an adverse witness. Grubbs inspected the bone-in saw two years after Milanes's injury. According to Grubbs, a band saw's primary safeguard for operator safety is an adjustable blade guard. The blade guard on the bone-in saw was not operational when he inspected it, however. Grubbs testified that a band

saw should not be operated if the blade guard is in the raised position.

Grubbs also testified regarding the importance of the manufacturer's manual for the saw. Grubbs stated that anyone operating a band saw should read the operator's manual first. He then testified that it is an employer's duty to train employees who will use a band saw based on the operator's manual. Grubbs testified that he believed the operator's manual for a band saw should be followed. He then opined that anyone not adequately trained on the operation of a band saw should not use it. Grubbs also opined that it was important for an employer using band saws to have written safety policies and procedures in place. Grubbs explained that written safety policies are important so employees know what they are supposed to do, and if they have questions, they know where to find the answers.

Grubbs next covered the importance of a regular inspection and maintenance program for band saws. Grubbs testified it is vital for an employer to have this type of program in place because it ensures that the band saws are properly maintained. Grubbs agreed that it was Kroger's responsibility to keep the bone-in saw in good working order. Grubbs also opined that an important part of an inspection and maintenance program is having properly trained and qualified personnel performing the inspections and maintenance on a band saw.

Grubbs testified again during Kroger's case. Grubbs discovered during his investigation that it was the Kroger meat cutters' habit not to use the blade guard. Grubbs then opined that because a piece of meat may vary in its height, it would be unrealistic, and ridiculous, to expect the meat cutters to adjust the blade guard to within one half inch of the top of the meat before each cut. Grubbs then opined that the blade guard, even if it was nonoperational, was not a factor in Milanes's accident. Finally, Grubbs testified that during his inspection of the bone-in saw, he

13

did not see any defects that would explain Milanes's accident.

**F.      Kroger employees testify regarding saw operation and maintenance.**

Kroger presented the testimony of several employees during the trial. Underwood, the top manager at the Post Oak Kroger, was one of them. Underwood initially testified regarding Kroger's policies and procedures. When he was shown Kroger's Meat/Seafood Department Safety Manual, Underwood could not locate the band saw maintenance and inspection program. Underwood then admitted that he did not know for sure whether Kroger had a written policy regarding inspection and maintenance of those saws. According to Underwood, only Kroger maintenance personnel should work on the band saws. Expanding on that, Underwood testified that the only thing meat cutters are authorized to do to the saws is change the blades. If anything else needs attention, the meat cutter should notify store management, who would then call in a service person.

Underwood denied being personally aware of any pre-injury safety complaints about the bone-in saw, including complaints about the saw's blades dulling too fast. Underwood explained that he was not the only manager at the store and the complaints could have been addressed to another manager. Underwood then testified that there should be a record of any maintenance or repairs performed on the store's saws. Underwood was unable to explain why there were no maintenance records for the bone-in saw predating Milanes's injury.

Matthew Anderson is a journeyman meat cutter and Kroger meat market manager. Anderson worked at the Post Oak Kroger about a year before Milanes's accident and therefore had no knowledge of the bone-in saw's condition on the day of Milanes's injury. Among other subjects, Anderson testified about cutting meat with a band saw. According to Anderson, a blade coming off the saw is not uncommon. Anderson had also experienced meat jumping or rolling. He

14

explained that meat jumping is unpredictable but certain circumstances, such as dull blades, increase the possibility it will happen. Anderson testified that for a blade to dull in thirty to forty minutes, "the saw would have to be so out of whack, [he did not] even see how you could use it." Anderson testified that if a band saw is making a loud noise, it is a sign that it needs maintenance or repair.

Anderson also testified regarding Kroger's policies and procedures regarding band saws. He admitted that he was never shown the operator's manual for the bone-in saw and did not know whether Kroger has a policy prohibiting workers from operating a meat saw without a blade guard in place. Anderson went on that when he trained people to operate a meat saw, he told them to use the blade guard and adjust it above the meat for safety reasons. He then admitted, however, that he would see people cutting meat without using the blade guard.

Javier Duran was the meat market manager for the Post Oak Kroger when Milanes's injury occurred. Duran testified that he was taught to use the blade guard during his training. Duran then admitted that the blade guard was not really used by the meat cutters at the Post Oak Kroger but was just left in the same position. Duran denied that Milanes ever complained to him about the bone-in saw not working properly or about the blades dulling too fast. He also denied telling Milanes to be conservative when changing blades. Duran admitted that meat jumps occasionally while it is being cut. According to Duran, meat jumping is generally unpredictable, but dull blades make it more likely to occur. Duran went on to explain that a meat cutter should change the blade before it gets so dull that it will lead to meat jumping.

Brent Nixon was the primary Kroger facility engineer responsible for maintenance at the Post Oak Kroger at the time Milanes was injured. Nixon's duties included maintenance on the Biro band saw even though he had not been

15

certified by Biro to perform maintenance on Biro saws. Nixon denied being aware of any problems with the bone-in saw before the accident. He also did not recall Milanes telling him that the bone-in saw needed repairs that were not being made. Nixon also had no explanation for the lack of repair and maintenance records predating Milanes's injury. Nixon insisted that maintenance was done on the bone-in saw prior to Milanes's injury and that there were records of that work.

Nixon was the facility engineer sent by Kroger to investigate the band saw several days after Milanes was injured. Nixon testified that he checked all aspects of the saw thoroughly, and as a final check he turned the saw on and then beat the moving band saw blade with a broom to "make sure [the blade was] not going to come off." Nixon reported that the only problem his investigation revealed was the lip on the cutting table, which he repaired. Nixon testified he was unable to find anything that would explain the accident.

## G.     The trial court signs a final judgment based on the jury's verdict in favor of Milanes.

At the conclusion of the evidence, the trial court proposed to submit the case to the jury on an ordinary negligence theory. Kroger objected to the trial court's proposed jury charge and argued the case should be submitted to the jury on a premises liability theory. The trial court overruled Kroger's objection and rejected its proposed premises liability question. The jury subsequently found Kroger liable and awarded Milanes damages totaling $1,093,440.89. The trial court, after crediting Kroger for the amount of medical expenses and wages it had already paid, signed a final judgment awarding Milanes $1,016,809.10 plus pre-judgment and post-judgment interest. This appeal followed.

16

## I.     The jury was properly charged on a negligence theory of liability.

Kroger argues in its first two issues that the trial court erred when it submitted the case to the jury under a negligence theory of liability. According to Kroger, it is "well-settled that to state a general negligence claim [against a landowner], there must be affirmative contemporaneous conduct by the owner at the time of the incident which led to the plaintiff's injury." Kroger contends that regardless of the theory of liability Milanes pled, Texas law and the evidence introduced at trial established that the only duty it owed Milanes was that of a premises owner. As a result, Kroger argues Milanes was limited to a premises liability theory of recovery. Given that Milanes did not submit such a theory to the jury, Kroger concludes it is entitled to a take-nothing judgment. We disagree because under supreme court precedent, Kroger also owed Milanes duties of care as his employer.

### A.     Standard of review

A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *E.I. DuPont de Nemours & Co v. Roye*, 447 S.W.3d 48, 56 (Tex. App.— Houston [14th Dist.] 2014, pet. dism'd) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex. 1999)). The parties have the right to be judged by a jury properly instructed in the law. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). The goal therefore, is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Roye*, 447 S.W.3d at 56. To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. *Id.* We review whether a challenged portion of a jury charge is legally correct using a de novo standard of review. *Id.* (citing *St. Joseph Hosp. v.*

17

*Wolff*, 94 S.W.3d 513, 525 (Tex. 2003)). In making this determination, we examine the allegations and proof introduced at trial. *Oncor Electric Delivery Co., LLC v. Murillo*, 449 S.W.3d 583, 592 (Tex. App.—Houston [1st Dist.] 2014, pet. filed) (en banc).

**B.     The pleadings and evidence support the trial court's submission of the negligence theory rather than a premises theory.**

The Texas Workers' Compensation Act permits private Texas employers to elect whether to subscribe to workers' compensation insurance. *Tex. W. Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 186 (Tex. 2012) (citing Tex. Lab. Code Ann. § 406.002(a) (West 2015)). If an employer elects to subscribe, then its employees generally are prohibited from suing it and must instead pursue their claims through an administrative agency. *Id.* In that administrative proceeding, employees need prove only that they were injured in the course and scope of their employment. *Id.*

If an employer elects to be a non-subscriber to workers' compensation insurance, as Kroger has, then it is subject to suits at common law for damages, to which it can raise only limited defenses. *Id.* In that situation, an employee injured on the job must file suit and "prove the elements of a common law negligence claim." *Id.* (citing Tex. Lab. Code Ann. § 406.033(d)); *Amigos Meat Distributors, L.P. v. Elizondo*, No. 01-10-00867-CV, 2011 WL 5026227, at *2 (Tex. App.—Houston [1st Dist.] Oct. 20, 2011, no pet) (mem. op.). To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach. *Austin v. Kroger Texas, L.P.*, No. 14-0216, 2015 WL 3641066, at *12 (Tex. June 12, 2015); *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006).

The supreme court has held that employers in Texas owe certain continuous,

18

non-delegable duties to their employees. *Farley v. M. M. Cattle Co.*, 529 S.W.2d 751, 754 (Tex. 1975) (abrogated on other grounds by *Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex. 1978)); *see Austin*, 2015 WL 3641066, at *15 (stating that employer may owe duties to employee in addition to those a landowner owes an invitee, including duties to train and supervise). Among these are the duties to (1) furnish a reasonably safe place to work, (2) warn employees of hazards of their employment that are not commonly known or already appreciated, (3) supervise employees' activities, (4) hire competent co-employees, (5) furnish reasonably safe instrumentalities with which to work, and (6) provide safety regulations. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 652 & n.10 (Tex. 2007); *Farley*, 529 S.W.2d at 754. An employer must also train employees in the safe use and handling of products and equipment used in and around an employer's premises or facilities. *Austin*, 2015 WL 3641066, at *15; *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 311 (Tex. App.—Houston [1st Dist.] 2007, no pet.). An employer must exercise ordinary care, based on standard negligence principles, in carrying out these duties. *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996); *Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex. 1995); *see Elwood*, 197 S.W.3d at 794 ("An employer has a duty to use ordinary care in providing a safe workplace.").

Milanes alleged and presented evidence during trial that Kroger breached some of these duties. This evidence includes, but is not limited to: the failure to provide reasonably safe equipment or instrumentalities necessary for the performance of Milanes's job; the failure to provide safety regulations related to Milanes's work; and the failure to instruct or train employees in the safe use and handling of equipment—specifically, the Biro band saw. *See Austin*, 2015 WL 3641066, at *15. Milanes testified that he was never provided the operator's manual for the Biro saw and he was not trained to use the adjustable blade guard

on the saw while cutting meat. In fact, he testified he was not even aware that the saw was equipped with a blade guard at all. In addition, both expert witnesses testified that the band saw should not be operated when the blade guard is not used or operational. The evidence also includes testimony from several witnesses that, prior to Milanes's injury: (1) the bone-in saw had an inoperable blade guard; (2) the saw was experiencing continuing problems such as rapidly dulling blades and improper blade tension; and (3) Kroger was unable to fix the problems yet did not take the saw out of operation. Because Milanes pled and introduced legally sufficient evidence demonstrating Kroger negligently breached duties it owed to him as an employee, we conclude that the trial court did not err when it submitted the negligence theory of liability to the jury. *See id.* at \*16 ("We therefore reject Kroger's argument that its lack of any negligent activity contemporaneous with [the plaintiff's injury] defeats [the plaintiff's] instrumentalities claim as a matter of law."); *see also Amigos Meat Distributors, L.P.*, 2011 WL 5026227, at \*3 (affirming judgment signed after jury found non-subscribing employer negligent based on evidence that employer failed to provide operator's manual for Biro band saw to employee meat cutter and also failed to train employee adequately on safe operation of saw).

The cases that Kroger cites in urging that its only duty to Milanes was that of a premises owner do not change this analysis. Most of Kroger's cases are distinguishable because they did not involve the employer/employee relationship.[4]

---

[4] *See, e.g., Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010) (involving suit filed by hotel guest, not employee); *In re Texas Dept. of Transp.*, 218 S.W.3d 74, 75 (Tex. 2007) (involving lawsuit against State of Texas arising out of car wreck); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 526 (Tex. 1997) ("In this case, we consider the liability of a general contractor and its on-site representative for injuries to an independent contractor's employee."); *Dallas Market Center Development, Co. v. Liedeker*, 958 S.W.2d 382, 383 (Tex. 1997) (concerning lawsuit filed by delivery person injured while loading flowers onto hotel's elevator) (overruled on other grounds by *Torrington Co. v. Stutzman*, 46 S.W.3d 839 (Tex.

20

The remainder of Kroger's cases involved employees injured by a premises condition or by conduct of a third party, neither of which is at issue.[5] Thus, as Kroger conceded at oral argument, none of these cases control the outcome here.[6]

The supreme court recently confirmed that, "[a]s [plaintiff's] employer, Kroger owed [him] duties in addition to its premises-liability duty and its duty not to engage in negligent activities, including the duty to provide [the plaintiff] with necessary instrumentalities." *Austin*, 2015 WL 3641066, at *15. We therefore overrule Kroger's first two issues on appeal.

## II. Milanes introduced legally and factually sufficient evidence that Kroger's negligence proximately caused Milanes's injuries and that he suffered lost earning capacity as a result of those injuries.

In its third issue, Kroger attacks the legal and factual sufficiency of the evidence of causation. In its fourth issue, Kroger contends Milanes introduced legally and factually insufficient evidence that his earning capacity was negatively impacted by his injury. We address each contention in turn.

---

2000)); *Keetch v. The Kroger Co.*, 845 S.W.2d 262, 263 (Tex. 1992) (customer, not employee, filed suit for injury sustained on defendant's premises); *Foodtown v. Tanguma*, No. 01-11-00047-CV, slip op. at 2 (Tex. App.—Houston [1st Dist.] Dec. 22, 2011, no pet.) (same).

[5] *See, e.g., Sears, Roebuck & Co. v. Robinson*, 280 S.W.2d 238, 240 (Tex. 1955) (employee injured by premises condition rather than instrumentality) (overruled by *Austin v. Kroger Texas, L.P.*, No. 14-0216, 2015 WL 3641066, at *12 (Tex. June 12, 2015)); *Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 466–67 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (plaintiff-employee victimized by third-party criminal act on employer's premises); *Allen v. Connolly*, 158 S.W.3d 61, 63 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (same).

[6] During oral argument, Kroger was unable to identify a case dictating the outcome it seeks in its first issue. Kroger instead asked this Court to change the law. This we cannot do because changing higher-court precedent is not the function of an intermediate court of appeals. *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 195 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("we must follow the Texas Supreme Court's expressions of the law and leave changes in the application of common-law rules to that higher authority"); *see also Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 476 (Tex. 2009) (Willet, J., concurring) ("Judges have no authority to second-guess the myriad policy judgments codified in the Workers' Compensation Act").

## A.    Standard of review

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. *Id.* at 550–51 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005)). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.* at 551. This Court must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. *Id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.*

This Court may sustain a legal sufficiency (or no evidence) issue only if the record reveals one of the following: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla. *Id.*

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting a finding for which it

did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 407; *Barnhart v. Morales*, 459 S.W.3d 733, 745 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *Barnhart*, 459 S.W.3d at 745. This Court is not a factfinder. *Id.* (citing *Ellis*, 971 S.W.2d at 407). Instead, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. We may not, therefore, pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would also support a different result. *Id.* If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Id.* (citing *Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex. 2006) (per curiam)).

**B. Sufficient evidence supports the jury's finding that Kroger's negligence proximately caused Milanes's injury.**

To prevail on a negligence claim, a plaintiff must prove not only that the defendant breached a duty, but also that he sustained damages proximately caused by that breach. *Torres v. Teassier*, 231 S.W.3d 60, 63 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002)). Proximate cause consists of two elements: cause in fact and foreseeability. *Del Lago Partners, Inc.*, 307 S.W.3d at 774.

Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). Cause in

23

fact is not shown if the defendant's conduct did no more than furnish a condition that made the injury possible. *Id.* The second element of proximate cause, foreseeability, requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). These elements cannot be established by mere conjecture, guess, or speculation. *Id.* at 477. Proximate cause may, however, be established by direct or circumstantial evidence and the reasonable inferences drawn from that evidence. *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 889 (Tex. App.—Texarkana 2004, pet. denied) (citing *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex. 1980)).

As detailed in the background section, Milanes introduced evidence that Kroger failed to maintain the Biro band saw properly. This includes evidence that Brent Nixon, the primary Kroger employee charged with maintaining and repairing the store's bone-in band saw, was not certified by the saw's manufacturer. The jury also heard evidence that Bell, a meat cutter and relief meat market manager, frequently attempted to repair the saw when employees reported problems to him despite Kroger's stated policy that the only thing meat cutters should do to a band saw was change out a dull blade. Other evidence of improper maintenance includes the lack of maintenance records and the meat cutters' testimony that problems with the saw were reported but never fixed.

Evidence of improper maintenance also included that the blade guard on the saw was inoperable and a loud noise emanated from the saw. Witnesses testified the noise could be caused by the blade hitting the blade scrapers or by incorrect blade tension. Numerous witnesses testified that improper blade tension was a frequent problem encountered while using the bone-in saw. Ryan, Milanes's mechanical engineering expert, testified that improper blade tension can cause a

24

wandering cut, increasing the possibility that the blade will bind in the meat and cause the meat to roll.

Evidence showed that if the tension on the blade is incorrect, it can cause the blade to pop off, resulting in the blade hitting the metal saw housing. Witnesses testified that they had experienced the blade popping off this saw, as confirmed by scratch marks on the inside of the housing. Ryan testified that frequent contact with the metal saw housing results in the rapid dulling of the saw's blade. Witnesses also testified that the bone-in saw's blade dulled at a very rapid rate, often within thirty to forty minutes of putting on a new blade. Kroger witnesses confirmed that if the blades were dulling at such a fast pace, something was very wrong with the saw.

Every meat cutter who testified during the trial agreed that meat sometimes jumps or rolls when it is being cut, and that it is normally unpredictable when jumping or rolling will happen. Several testified, however, that the probability of meat jumping or rolling increases when the saw's blade is dull. Milanes himself testified he reported to Kroger management that the saw was frequently catching the meat and sucking it into the blade. He also testified that he noticed the blade was dull the day of his injury. Although Milanes had the discretion to change out a dull blade when he deemed it necessary, he testified that he was encouraged by store managers to be conservative when using blades and that there was a financial incentive for those managers to come in under budget.[7]

Apart from improper maintenance and problems with blade tension and dulling, there was also evidence that Kroger failed to provide safety regulations and train Milanes and other employees properly on the safe operation of the Biro

---

[7] A non-subscribing employer may not assert any negligence by an employee as a defense. *See* Tex. Lab. Code Ann. § 406.033(a) (West 2015).

band saw—particularly that the blade guard should be used at all times. Milanes testified that he was not even aware of the existence of a blade guard and was not using it on the day of his injury. There was also evidence that (1) it was the common practice of Kroger's meat cutters to not use the blade guard, and (2) Kroger managers were aware of this practice but chose to do nothing about it. Both expert witnesses testified that a band saw should not be used without the blade guard. Ryan explained that the accident would not have occurred, and Milanes would not have been injured, if the blade guard had been used as required by the operator's manual.

For these reasons, we conclude there is legally and factually sufficient evidence that Kroger's breach of the duties to provide safe equipment and safety regulations and to train employees in the safe use of equipment proximately caused Milanes's injury. We overrule Kroger's third issue on appeal.

### C. Sufficient evidence shows that Milanes lost earning capacity as a result of his injury.

In its third issue, Kroger contends Milanes presented legally and factually insufficient evidence of lost earning capacity resulting from the amputation of three fingers on his dominant right hand while he was cutting meat with Kroger's bone-in saw. In making this argument, Kroger points out that Milanes returned to work at the same Kroger store following his injury at the same rate of pay. It goes on to argue that the only reason he lost this job was the result of his own insubordination, and thus there is no evidence of lost earning capacity as a result of his injury. Kroger makes no other argument about the insufficiency of the evidence supporting the jury's award of $151,744 in damages for lost earning capacity.

Loss or impairment of earning capacity is a recognized element of damages

in a personal injury case. *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 435 (Tex. App.–Houston [14th Dist.] 2002, no pet.). Earning capacity has been defined as the ability and the fitness to work in gainful employment for any type of compensation, including salary, commissions, and other benefits. *Id.* at 435 n.2. The plaintiff has the burden of proving loss of earning capacity. *Id.* The measure of this type of damage is the plaintiff's diminished earning power or earning capacity, in the past or future, directly resulting from the injuries sustained in the accident. *Id.* To support an award of damages for lost earning capacity, the plaintiff generally must introduce evidence from which a jury may reasonably measure in monetary terms his earning capacity prior to injury. *Id.* at 435–436. Specific proof of actual earnings and income are evidence of lost earning capacity. *Id.* at 436.

The jury heard evidence regarding Kroger's treatment of Milanes after his injury. This includes testimony that as soon as four weeks after his accident, Kroger began pressuring Milanes to return to work. The record also contains evidence that once Milanes returned, he was put back to work in the meat department in close proximity to the department's band saws despite his doctors' concerns that he should not be required to work around the bone-in saw. The jury also heard Underwood's testimony that Milanes could possibly transfer out of the meat department, but his pay rate would be different if he did so. There was also evidence that once Milanes returned to work on light duty, he had no specific job duties, but instead did little more than talk to customers.

The jury heard the testimony addressing Milanes's termination, including Underwood's testimony that Milanes was fired for insubordination when he refused to carry out an order to change the meat department hose. They also heard Milanes's testimony that he was still on light duty and experiencing pain in his

right hand at that time. Although Milanes admitted that he did not tell Underwood that he was physically incapable of doing the task, he did tell Underwood that his refusal was a light duty issue. As the trier of fact and sole judge of the credibility of the witnesses, the jury could have disbelieved Underwood's testimony that Milanes was fired for insubordination, believed that Milanes refused to change out the hose due to the condition of his injured hand and sufficiently informed Underwood of that fact, and found that the termination was related to Milanes's injury. Kroger has not briefed any challenge to Milanes's testimony regarding his post-termination inability to secure other long-term employment due to his injury, nor has it challenged the testimony of Milanes's expert economist quantifying Milanes's loss of past and future earning capacity.[8]

We hold there is legally and factually sufficient evidence supporting the jury's finding that Milanes's loss of earning capacity resulted from his work-related injury. We overrule Kroger's fourth issue on appeal.

### III. The trial court did not abuse its discretion when it admitted Milanes's post-accident photographs and videos into evidence.

Kroger asserts in its fifth issue that the trial court abused its discretion when it admitted into evidence five photographs (Plaintiff's Exhibits 5, 6, and 7) and three videos (Plaintiff's Exhibits 10, 12, and 13) taken by Milanes after he returned to work.[9] According to Kroger, the trial court should have excluded the

---

[8] Milanes testified regarding his desire to work, his inability to do manual-labor jobs like those he had been trained to perform, and his departure from a job pulling parts at a warehouse because he kept dropping the parts. His expert, Dr. Donald Huddle, testified regarding Milanes's loss of his Kroger salary ($16.69 per hour) and benefits up to the time of trial. He also testified regarding the present value of the salary and benefits Milanes would lose over his expected future work life, assuming that Milanes would be able to find employment at a lower salary. The jury awarded approximately the amount Dr. Huddle calculated for past lost earning capacity, and less than half of the lowest amount he calculated for future lost earning capacity.

[9] In a letter brief filed following oral argument, Kroger identified a sixth photograph, Plaintiff's Exhibit 8, as a photograph it was challenging the admission of on appeal. Kroger did

photographs and videos because they were taken illegally and also because they were not relevant given that all were taken after the accident.

## A.    Standard of review

The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007).    A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Barnhart*, 459 S.W.3d at 742 (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002)).    When reviewing matters committed to the trial court's discretion, a reviewing court may not substitute its own judgment for that of the trial court. *Id.* Thus, the question is not whether this court would have admitted the evidence. Rather, an appellate court will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that ground was not raised in the trial court. *Id*.    Therefore, we examine all bases for the trial court's decision that are suggested by the record or urged by the parties. *Id.*

A party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in rendition of an improper judgment, which usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.*    To determine whether evidentiary error probably resulted in the rendition of an improper judgment, an appellate court reviews the entire record. *Id.* (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001)).

---

not, however, object to the admission of Exhibit 8 during trial.    Kroger therefore has not preserved its complaint regarding the admission of this photograph for appellate review.  Tex. R. App. P. 33.1; *Grace Interest, L.L.C. v. Wallis State Bank*, 431 S.W.3d 110, 122 (Tex. App.— Houston [14th Dist.] 2013, pet. denied).

**B.** **Kroger has not shown an abuse of discretion in admitting the challenged photographs and videos.**

Kroger makes two separate arguments in its fifth issue. First, it asserts that the challenged photographs and videos should have been excluded because they were obtained by illegal means. Second, Kroger contends the photographs and videos were not relevant because they were taken months after Milanes was injured. We address Kroger's second contention first.

### 1. *The challenged photographs and videos were relevant.*

Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence is generally admissible, irrelevant evidence is generally inadmissible. *Id.* at 402. Facts existing both before and after an event in controversy may be relevant to establishing the cause of that event. *City of Houston v. Leach*, 819 S.W.2d 185, 191 (Tex. App.—Houston [14th Dist.] 1991, no writ).

Generally, pictures or photographs relevant to any issue in a case are admissible. *Huckaby v. A.G. Perry & Sons, Inc.*, 20 S.W.3d 194, 209 (Tex. App.—Texarkana 2000, pet. denied). When a photograph or video portrays facts relevant to an issue, it is admissible if verified by a witness as being a correct representation of the facts. *Cheek v. Zalta*, 693 S.W.2d 632, 635 (Tex. App.—Houston [14th Dist.] 1985, no writ). The verifying witness must know the object involved and be able to state that the photograph or video correctly represents it. *Id.* The fact that the scene or the object portrayed in the photograph or video has changed since the time of the event in question in the litigation does not prevent the admission of the photograph or video into evidence if the changes are explained in such a manner that the photograph or video will help the jury in

understanding the nature of the condition at the time of the event at issue. *Id.* Indeed, the parties' experts inspected the saw well after Milanes took the challenged photos and videos, and photos and videos from expert Ryan's inspection were also introduced into evidence. A dispute as to the accuracy of some part of the photograph or video usually goes only to the weight of the evidence, not to its admissibility. *See id.*; *see also Garza v. Cole*, 753 S.W.2d 245 247 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (stating that conditions shown in video need not be identical to those at time of event in question for video to be admissible into evidence).

Plaintiff's Exhibit 5 is a photograph of the Post Oak Kroger's bone-in saw wrapped in clear plastic. Plaintiff's Exhibit 6 contains three photographs of the blade cleaners on the same bone-in saw. William Quintero, a journeyman meat cutter at the Post Oak Kroger, testified that these photographs fairly and accurately depicted the bone-in saw Milanes was using. Plaintiff's Exhibit 7 is another photograph of the Post Oak Kroger's bone-in saw. Milanes testified that he took the photograph and that it fairly and accurately depicted the bone-in saw he used. Because witnesses testified that the challenged photographs accurately depicted the bone-in saw, we conclude that the trial court did not abuse its discretion when it overruled Kroger's relevance objections and admitted Exhibits 5, 6, and 7 into evidence. *See Cheek*, 693 S.W.2d at 635.

Plaintiff's Exhibit 10 is a 28-second video showing the bone-in saw running with a loud noise emanating from it. Milanes testified that Exhibit 10 portrayed the bone-in saw and that the noise heard on the video was the same as the noise the saw was making when he was injured. Plaintiff's Exhibit 12 is another brief video. Milanes, who took the video, testified that it showed a boneless band saw at the Post Oak Kroger, which was running correctly. The saw shown in Exhibit 12 did

not emit a loud noise while it was running. Plaintiff's Exhibit 13 is a 14-second video of a non-operational bone-in saw at the Post Oak Kroger. The video shows that the blade had popped off the saw. On the video, Milanes says: "once again the saw is broken in the same day they said they fixed it." Milanes testified that the videos portrayed the same circumstances that were present before he was injured and they would be helpful to the jury during his testimony. We conclude that the trial court did not abuse its discretion when it overruled Kroger's relevance objections and admitted the three videos into evidence. *See Cheek*, 693 S.W.2d at 635.

### 2.   *The challenged photographs and videos were not illegally obtained.*

Kroger also objected to the admission of the photographs and videos based on its contention that they were all taken illegally. Kroger cites no authority supporting its position. *Cf.* Tex. Civ. Prac. & Rem. Code Ann. § 123.002 (West 2011) (creating a civil cause of action against a person who intercepts another person's communication); Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005) (providing that no evidence obtained in violation of either the constitution or laws of the United States or the State of Texas "shall be admitted in evidence against the accused on the trial of any criminal case."). Further, we find nothing in the record to suggest that Milanes committed either the offense of criminal trespass, Tex. Penal Code Ann. § 30.05 (West Supp. 2014), or the offense of improper photography or visual recording. *Id.* § 21.15 (West 2011). We hold that the trial court did not abuse its discretion when it overruled Kroger's "illegally obtained" objection and admitted the challenged photographs and videos into evidence. Having rejected each argument raised by Kroger in its fifth issue, we overrule that issue.

**IV.** **Kroger has not shown that it was harmed by the trial court's alleged failure to intervene to remedy perceived juror misconduct.**

In its sixth issue, Kroger contends the trial court abused its discretion when it refused to grant Kroger a new trial based on the allegation that the trial court failed to intervene timely to correct potential juror misconduct. We conclude Kroger is not entitled to a new trial because it has not demonstrated it was harmed as a result of any alleged failure to intervene by the trial court.

Kroger's motion for new trial attached an affidavit from one of the jurors in the case. In the affidavit, the complaining juror stated that after the jury began its deliberations, she came to believe that some other members of the jury were violating instructions contained in the court's charge. The complaining juror alleged that, during the jury's deliberations, an attorney member of the jury offered his own definitions of legal phrases and words derived from his own personal experience as an attorney. The complaining juror also alleged that a second juror contributed her thoughts based on her personal experience as a legal assistant. The complaining juror did not allege that any outside influence was brought to bear on the jurors during their deliberations. The complaining juror stated that she asked, through the bailiff, to speak with the trial judge about her concerns; however, the trial judge did not speak with the juror during the remainder of the jury's deliberations.

The jury reached and delivered its 10-2 verdict in favor of Milanes. The complaining juror, believing that the misconduct she perceived had impacted the jury's verdict, alleged that she again asked to speak with the trial judge. According to the complaining juror, the trial judge was in court at the time, and the juror was told she could wait until he was finished to speak with him. The complaining juror decided to leave the courthouse before the trial judge was able to speak with her,

however.

During the hearing on Kroger's motion for new trial, the trial judge stated that he had addressed with the parties a prior complaint made by this juror following jury selection, but that he was not provided notice of the juror's alleged request during deliberations. The trial judge found the juror's allegations not credible and denied the motion for new trial.

Kroger argues it is entitled to a new trial based on judicial misconduct: specifically, the trial court's failure to investigate the complaining juror's allegations that members of the jury had violated the trial court's instructions during their deliberations. To reverse a judgment on the basis of judicial misconduct, a reviewing court must conclude both that judicial impropriety occurred and that the complaining party suffered harm. *See Silcott v. Oglesby*, 721 S.W.2d 290, 293 (Tex. 1986); *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Because we conclude that Kroger has not shown it was harmed as a result of the trial court's alleged failure to intervene to correct the perceived juror misconduct, we need not decide whether any judicial impropriety occurred, and we therefore express no view on that issue.

Given that the complaining juror's allegations did not involve outside influence, Kroger's attempt to show harm through an examination of the jury's discussions during its deliberations is prohibited by both Rule 327(b) of the Texas Rules of Civil Procedure and Rule 606 of the Texas Rules of Evidence. *See* Tex. R. Civ. P. 327(b) ("A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon

any juror."); Tex. R. Evid. 606(b) (prohibiting a juror from testifying about jury's deliberations unless allegation involves outside influence). Kroger admits there was no outside influence brought to bear on the jury.

Instead, Kroger argues that certain jurors violated the trial court's instructions during the jury's internal deliberations. To substantiate this claim, Kroger offers only the affidavit testimony of a member of the jury regarding deliberations—evidence that Kroger is prohibited from using.[10] *See id.* Because we (like the trial court) cannot consider the only evidence offered by Kroger to establish it was harmed by the judge's alleged misconduct in failing to address the jurors' perceived violations during deliberations, we conclude Kroger has failed to show harm. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000) (holding that rules prevent juror from testifying that jury discussed improper matters during deliberations). Thus, the trial court did not abuse its discretion in denying Kroger's motion for new trial. We overrule Kroger's sixth issue.

## CONCLUSION

Having overruled each of the issues Kroger raised in this appeal, we affirm the trial court's judgment.

/s/ J. Brett Busby
Justice

Panel consists of Justices Jamison, Busby, and Brown.

---

[10] Of course, the juror's allegation that she asked the bailiff for an opportunity to speak to the trial judge about her concerns regarding deliberations is not itself evidence of matter occurring during deliberations, though the trial judge found her allegations not credible. Yet even if we assumed for the sake of argument that the request was made and the trial court should have pursued it, the court would have learned no more than the allegations in the juror's affidavit regarding what occurred in deliberations, which "cannot form the basis of a motion for new trial." *In re Zimmer, Inc.*, 451 S.W.3d 893, 897 n.1 (Tex. App.—Dallas 2014, orig. proceeding).