**Reversed and Rendered in Part, Reversed and Remanded in Part, and Majority and Concurring Opinions filed June 14, 2022.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-19-00905-CV

---

## DIAMOND OFFSHORE DRILLING, INC. AND DIAMOND RIG INVESTMENTS LTD., Appellants

### V.

## WILLIAM BLACK, Appellee

---

**On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 2015-74728**

---

## M A J O R I T Y   O P I N I O N

Appellee William Black was injured while working as a mechanic on board a mobile offshore drilling unit docked in Spain. Black sued appellants Diamond Offshore Drilling, Inc. ("Diamond Drilling") and Diamond Rig Investments Limited ("Diamond Rig") (together, "Appellants") for damages stemming from the incident.

The parties proceeded to trial and the jury returned a verdict in Black's favor, finding that both Appellants were negligent with respect to the incident. The trial court signed a final judgment awarding Black $2.2 million in damages.

On appeal, Appellants challenge (1) the wording of the sole jury question on liability; (2) the legal and evidentiary bases for liability with respect to each Appellant; and (3) the sufficiency of the evidence supporting the damages assessed for Black's future medical expenses. For the reasons below, we reverse the trial court's judgment, render judgment in part, and remand the case in part for further proceedings in accordance with this court's opinion.

## BACKGROUND

*Facts*

Black is a citizen and resident of the United Kingdom. Black was injured on January 2, 2015, while working as a mechanic on board the Ocean Valiant, a mobile offshore drilling unit. As Black was working on a piece of equipment located below knee level, he sat on a bucket containing a caustic cleaning chemical called "AlfaNeutra." The bucket's lid was not completely fastened and, when Black sat down, the AlfaNeutra leaked out and soaked through Black's clothes. Shortly after, Black started to feel a burning pain on his right buttock.

Black initially was treated on the ship by Daryl Tankersley, a safety department representative. Black then was transported to a local hospital, where his wound was dressed. Black returned to the ship the same day and continued working.

Over the next several days, Black's pain continued to worsen. Black returned home to the United Kingdom and visited his local doctor. Black's injury was diagnosed as a third-degree chemical burn and he was scheduled for a skin

graft the following day. Black remained in the hospital for a week following his surgery. Approximately five months later, Black's employment was terminated as part of a planned reduction-in-force.

As relevant to this appeal, we provide a brief overview of several Diamond entities involved in the facts and circumstances giving rise to this case:

- In January 2008, Black signed a written employment agreement with Diamond Offshore Drilling (Bermuda) Limited ("Diamond Bermuda"). This agreement required Black to bring any claims against Diamond Bermuda "in the courts of Bermuda."

- Diamond Bermuda is an "employment subsidiary" of parent corporation Diamond Drilling. Diamond Bermuda employs third-country nationals like Black.

- Diamond Offshore Services Limited is another "employment subsidiary" of parent corporation Diamond Drilling. Diamond Offshore Services Limited employs United States citizens.

- Diamond Drilling maintains its office in Houston, Texas and has no employees.

- At the time of the incident, Diamond Rig owned the Ocean Valiant.

- Diamond Rig is a wholly-owned subsidiary of Diamond Drilling. Like Diamond Drilling, Diamond Rig has no employees.

- The seamen working on the Ocean Valiant at the time of Black's injury had employment agreements with Diamond Bermuda and Diamond Offshore Services Limited.

### *Legal Proceedings*

In December 2015, Black sued Diamond Drilling and two other Diamond entities,[1] asserting claims under the Jones Act, the general maritime law of the United States, and the laws of the United Kingdom. In his first amended petition,

---

[1] Specifically, Black also asserted claims against Diamond Offshore Drilling, Limited and Diamond Offshore General Company. Diamond Drilling is the parent corporation of both entities.

3

Black added Diamond Rig and Diamond Bermuda as defendants.

The defendants moved to dismiss Black's suit based on the forum selection clause in his employment agreement with Diamond Bermuda and the trial court granted the defendants' motion. This court reversed and remanded, holding that the non-signatory defendants — *i.e.*, all defendants other than Diamond Bermuda — were "not parties to or otherwise within the scope" of the employment agreement, that Black's claims against the non-signatory defendants "do not arise from the Agreement," and those claims are based on statute and common law. *See Black v. Diamond Offshore Drilling, Inc.*, 551 S.W.3d 346, 353, 355 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

On remand, the defendants filed two motions for summary judgment. In their first motion, the defendants requested that the trial court dismiss Black's claims against Diamond Drilling and the two other Diamond Offshore entities "as they neither employed [Black] . . . nor owned the rig to which he was assigned." In their second motion, the defendants sought the dismissal of Black's Jones Act and general maritime law claims. The trial court denied both motions.

The parties proceeded to a four-day jury trial. Before closing arguments, the trial court granted a directed verdict on Black's Jones Act claim. The jury returned a verdict finding that Diamond Drilling, Diamond Rig, and Black were negligent with respect to the incident. The jury apportioned liability as follows: 52% to Diamond Drilling; 28% to Diamond Rig; and 20% to Black. The jury assessed $2.75 million in damages. The trial court signed a final judgment on August 20, 2019, awarding Black $2.2 million in damages.

Appellants timely appealed.

4

Appellants raise three issues on appeal and contend that (1) jury charge Question No. 1 submitted an immaterial claim that cannot support Black's recovery; (2) there is neither a legal nor evidentiary basis to support the imposition of liability as to either Appellant; and (3) the evidence is insufficient to support the $1 million assessed as damages for Black's future medical care expenses.

We overrule Appellants' first issue and conclude that the alleged error in the jury charge did not render Question No. 1 immaterial. We overrule in part and sustain in part Appellants' second challenge and hold that (1) a sufficient legal and evidentiary basis supports the imposition of liability against Diamond Drilling, and (2) an insufficient evidentiary basis supports liability against Diamond Rig. In light of this disposition of Appellants' second issue, we need not reach Appellants' third issue.

We develop these issues more fully below.

## I.      Question No. 1

In their first issue, Appellants contend that Question No. 1 submitted a Jones Act claim that is foreclosed as a matter of law because the phrase "proximate cause" was omitted and replaced with "cause, in whole or in part." Specifically, Appellants contend that the absence of the phrase "proximately caused" automatically incorporated the "featherweight" causation standard utilized for Jones Act claims. *See Noble Drilling (US) Inc. v. Fountain*, 238 S.W.3d 432, 439-40 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Under the Jones Act, a seaman is entitled to recovery if his employer's negligence is the cause, in whole or in part, of his injury. . . . The burden to establish causation under the Jones Act has been termed 'featherweight.'").

5

Appellants liken this situation to that analyzed in *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463 (Tex. 2017). There, the plaintiff sued the defendant after he slipped on a piece of plywood and fell through a scaffold. *Id.* at 467. The parties proceeded to trial and the plaintiff's claim was submitted to the jury as a general negligence claim. *See id.* at 469. But after considering the plaintiff's injury, his pleadings, his allegations, and the evidence presented at trial, the supreme court held the claim sounded in premises liability. *See id.* at 469-79. Concluding that "the theory of recovery submitted to the jury did not reflect the claim that was raised by the pleadings and the evidence," the court held that the jury's general negligence finding could not support recovery in a premises defect case. *Id.* at 480-81.

Similarly, Appellants contend that the alleged error in Question No. 1 shows that Black submitted a Jones Act claim that cannot support his recovery. We disagree.

First, the question submitted here did not omit a specific element necessary to support Black's recovery under a general negligence theory. "The elements of negligence are a legal duty, breach of that duty, and damages proximately caused by the breach." *Hernandez v. Gonzalez-Flores*, 530 S.W.3d 253, 256 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Each of these elements was substantially submitted to the jury. Even though the element of causation as stated in Question No. 1 neglected to include the "proximate" designation, the definition of "proximate cause" was included in the "Definitions and Instructions" portion of the charge immediately preceding Question No. 1. *See also United Scaffolding, Inc.*, 537 S.W.3d at 480-81 (noting that the elements of premises liability were not submitted as "instructions or definitions").

Under these circumstances, the omission of the phrase "proximate cause"

6

from Question No. 1 did not submit another or wrong theory of liability to the jury; instead, it constituted (at most) "an independent theory of recovery [that] [wa]s submitted defectively." *See id.* at 481. Any objections to such error must be made to the trial court or they are waived. *Id.*; *see also Chang v. Denny*, No. 05-17-01457-CV, 2019 WL 3955765, at \*5 (Tex. App.—Dallas Aug. 22, 2019, pet. denied) (mem. op.) (the defendant was required to object to the jury charge because his "complaint is with the wording of the question and whether it should have tied diligence to the filing of the lawsuit instead of prosecuting the claim"); *Free v. Lewis*, No. 13-11-00113-CV, 2012 WL 3242090, at \*8 (Tex. App.—Corpus Christi Aug. 9, 2012, no pet.) (mem. op.) (the defendant was required to object to the charge to preserve his complaint that the jury question omitted one of the elements necessary to support a breach of contract claim). Here, Appellants did not object to the alleged error in Question No. 1, and the failure to do so waives the complaint Appellants assert on appeal.[2] *See* Tex. R. Civ. P. 274, 279; *see also Chang*, 2019 WL 3955765, at \*5; *Free*, 2012 WL 3242090, at \*8.

Second, we have carefully examined the charge at issue and compared it with the Fifth Circuit's pattern instruction for Jones Act claims.[3] These pattern

---

[2] In his concurring opinion, Justice Jewell asserts that Appellants "do not challenge the omission of proximate cause from the negligence question" but instead "argue that the omission of proximate cause means that the question was not a negligence question at all." *See* Concurring Op. at 5 n.2. We agree that this is how Appellants attempt to frame the argument raised in their first issue. However, because the thrust of Appellants' issue challenges the omission of "proximate cause" from Question No. 1, we construe this as a challenge to the wording of the question itself — an argument that requires a timely objection in the trial court. *See* Tex. R. Civ. P. 274, 279; *see also Chang*, 2019 WL 3955765, at \*5; *Free*, 2012 WL 3242090, at \*8.

[3] Fifth Circuit District Judges Association Pattern Jury Instructions Committee, *Pattern Jury Instructions, Civil Cases* § 4.4 (2014).

> Under the Jones Act, Plaintiff [name] must prove that [his/her] employer was negligent. Negligence is doing an act that a reasonably prudent person would not do, or failing to do something that a reasonably prudent

jury charges counsel against the conclusion that Question No. 1 submitted a Jones Act claim.

Finally, *United Scaffolding* emphasized that a theory of premises liability required four specific findings in addition to the general negligence elements that

person would do, under the same or similar circumstances. The occurrence of an accident, standing alone, does not mean that anyone was negligent or that anyone's negligence caused the accident.

In a Jones Act claim, the word "negligence" is liberally interpreted. It includes any breach of duty that an employer owes to its employees who are seamen, including the duty of providing for the safety of the crew. Under the Jones Act, if the employer's negligent act was the cause, in whole or in part, of injury to a seaman employee, then you must find that the employer is liable under the Jones Act. In other words, under the Jones Act, Defendant [name] bears the responsibility for any negligence that played a part, however slight, in causing Plaintiff [name]'s injury.

Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that Plaintiff [name] was injured because Defendant [name] failed to furnish [him/her] with a reasonably safe place to work, and that Plaintiff [name]'s working conditions could have been made safe through the exercise of reasonable care, then you must find that Defendant [name] was negligent.

The fact that Defendant [name] conducted its operations in a manner similar to that of other companies is not conclusive as to whether Defendant [name] was negligent or not.

You must determine if the operation in question was reasonably safe under the circumstances. The fact that a certain practice had been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances. A long-accepted practice may be an unsafe practice. A practice is not necessarily unsafe or unreasonable, however, merely because it injures someone.

A seaman's employer is legally responsible for the negligence of one of [his/her] employees while that employee is acting within the course and scope of [his/her] [job] [employment].

If you find from a preponderance of the evidence that Defendant [name] assigned Plaintiff [name] to perform a task that the Plaintiff [name] was not adequately trained to perform, you must find that Defendant [name] was negligent.

8

were submitted to the jury.[4]  Here, Black's theory of liability "was submitted to the jury under only a general negligence theory of recovery, without the elements of premises liability as instructions or definitions."  Therefore, this verdict could not support the plaintiff's recovery in a premises defect case.  *See United Scaffolding, Inc.*, 537 S.W.3d at 480-81.

We overrule Appellant's first issue.

## II.     Legal and Evidentiary Bases for Liability

In their second issue, Appellants contend that (1) there is no legal basis for the imposition of a duty as to either Appellant, and (2) there is no evidentiary basis to support the existence or breach of a duty as to either Appellant.  We consider these arguments separately.

### A.     Legal Basis

Appellants' argument concerning the legal basis of an imposed duty is comprised of two parts.

First, Appellants assert that the "jury charge contains no predicate findings necessary to establish that these separate and distinct Diamond entities owed a cognizable legal duty towards Black under the circumstances in which the Jones Act and general maritime law do not apply."  Specifically, Appellants argue that no jury findings were requested or made with respect to alter ego, agency, respondeat superior, or any other legal theory that could establish a cognizable duty on the part

---

[4] Specifically, those elements include that the (1) defendant had actual or constructive knowledge of some condition on the premises; (2) condition posed an unreasonable risk of harm to the plaintiff; (3) defendant did not exercise reasonable care to reduce or to eliminate the risk; and (4) defendant's failure to use such care proximately caused the plaintiff's personal injuries. *United Scaffolding, Inc.*, 537 S.W.3d at 471-72 (citing *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1983)); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges:  Malpractice, Premises, Products* PJC 66.4 (2020).

of the Diamond entities separate from Diamond Bermuda, with whom Black had signed an employment agreement.

This argument is similar to those analyzed and rejected in *Service Corporation International v. Guerra*, 348 S.W.3d 221 (Tex. 2011), and *Ross Stores, Inc. v. Miller*, 612 S.W.3d 682 (Tex. App.—Houston [14th Dist.] 2020, no pet.). In *Service Corporation International*, the plaintiffs sued a cemetery operator and its parent corporation after their relative's body was moved to another burial plot without their consent. 348 S.W.3d at 227. The jury returned a verdict in favor of the plaintiffs. *Id.* On appeal, the defendants challenged the predicate findings necessary to support the plaintiffs' negligence claim and argued the jury charge failed to "contain a separate question asking if any of the actors were [the parent corporation's] employees." *Id.* at 228. Rejecting this argument, the court stated that "[w]hether the actors involved in this case were [the parent corporation's] employees was not an independent ground of recovery; the actors' status as employees was an *element* of the [plaintiffs'] negligence claim against [the parent corporation]." *Id.* (emphasis in original). The court further held:

> When an element of the claim is omitted from the jury charge without objection and no written findings are made by the trial court on that element then the omitted element is deemed to have been found by the court in such manner as to support the judgment. Here there was no objection to the charge on the basis that it omitted the element nor did the trial court make a finding on it, so there is a deemed finding in support of the judgment.

*Id.* at 228-29 (internal citations omitted).

In *Ross Stores, Inc.*, the plaintiff sued the parent corporation of Ross Dress for Less, Inc. after he sustained injuries in a physical altercation at work. 612 S.W.3d at 685. The jury returned a verdict for the plaintiff on his negligence claims. *Id.* On appeal, the parent corporation argued that the evidence was legally

insufficient to support the jury's negligence finding since the plaintiff was not an employee of the parent corporation nor did the parent corporation assume control over its subsidiary's safety policies. *Id*. at 687-88. In response, the plaintiff argued that the parent corporation waived this issue by failing to request "a threshold fact question 'calculated to determine the question of duty.'" *Id*. at 688. But as in *Service Corporation International*, the parent corporation's argument focused on an element of the plaintiff's negligence claim. *Id*. "[T]here was no objection to the charge on the basis that it omitted the element, and the trial court did not make a finding on this element, so there [was] a deemed finding in support of the judgment." *Id*. The court proceeded to analyze whether this deemed finding was supported by legally sufficient evidence. *See id*. at 687-91.

Here too, the question of whether either Appellant had a relationship with the actors in this case sufficient to support the imposition of a duty was an element of Black's claims against Appellants. *See Serv. Corp. Int'l*, 348 S.W.3d at 228-29; *Ross Stores, Inc.*, 612 S.W.3d at 686. There was no objection to the charge on grounds that this element was omitted nor were written findings made by the trial court on this point. Therefore, the omitted element is deemed to have been found by the trial court in such a manner as to support the judgment. *Serv. Corp. Int'l*, 348 S.W.3d at 229; *Ross Stores, Inc.*, 612 S.W.3d at 686. But as with other findings, there must be evidence in the record to support a deemed finding. *Serv. Corp. Int'l*, 348 S.W.3d at 229; *Ross Stores, Inc.*, 612 S.W.3d at 686. In the following sections, we undertake this evidentiary analysis separately with respect to each Appellant.

Second, Appellants argue that Black's untimely-filed "Notice of Intent to Rely on Foreign Law" cannot supply a legal basis for the duty imposed on Appellants. Black's notice sought to apply English law to the substantive legal

issues in the case. Under Texas Rule of Evidence 203, a party "who intends to raise an issue about a foreign country's law must: (1) give reasonable notice by a pleading or writing; and (2) at least 30 days before trial, supply all parties a copy of any written materials or sources the party intends to use to prove the foreign law." Tex. R. Evid. 203. "If the party seeking the application of foreign law fails to provide the necessary information to the trial court, there is a presumption that the law of the foreign jurisdiction is identical to that of Texas." *Cal Dive Offshore Contractors Inc. v. Bryant*, 478 S.W.3d 914, 921 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *PennWell Corp. v. Ken Assocs., Inc.*, 123 S.W.3d 756, 764 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Here, Black's first amended petition invoked English law to govern his claims. Specifically, Black pleaded English law claims as an alternative to his Jones Act and general maritime claims. But Black's "Notice of Intent to Rely on Foreign Law" was filed four days before trial began, thus failing to comply with Rule 203's thirty-day filing deadline for sources establishing the substance of the foreign law. *See* Tex. R. Evid. 203. Accordingly, Black only may rely on Texas law to establish a cognizable basis for liability with respect to Appellants. *See Cal Dive Offshore Contractors Inc.*, 478 S.W.3d at 921; *PennWell Corp.*, 123 S.W.3d at 764.

Under Texas law, a plaintiff seeking to establish liability for negligence must prove the existence and violation of a duty owed to him by the defendant. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *Kukis v. Newman*, 123 S.W.3d 636, 639 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The existence of a duty is a question of law for the court to decide from facts surrounding the occurrence in question. *Gator Gone Safety Pilots v. Holt*, 622 S.W.3d 524, 536 (Tex. App.—Houston [14th Dist.] 2021, no pet.); *Finley v. U-*

12

*Haul Co. of Ariz.*, 246 S.W.3d 185, 187 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

When the trial court submits a negligence question to the jury, the court has implicitly concluded that a duty exists — a decision we review *de novo*. *Gator Gone Safety Pilots*, 622 S.W.3d at 536. Appellants challenged this implied finding in their JNOV motion, thus preserving the issue for appellate review. *See, e.g.*, *id.* at 536 n.6. In the following analyses, we examine whether the evidence is legally sufficient to support this implied finding.

### B. Evidentiary Basis: Diamond Drilling

Appellants contend that "the record does not support Black's effort to cobble together a duty" owed by Diamond Drilling to Black. In response, Black argues that Diamond Drilling "owed duties to Black as his employer and the employer of his fellow crew members."

### 1. Applicable Law and Standard of Review

"Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000); *Kuentz v. Cole Sys. Grp., Inc.*, 541 S.W.3d 208, 213 (Tex. App.—Houston [14th Dist.] 2017, no pet.). One such special relationship is that between employer and employee. *Verinakis v. Med. Profiles, Inc.*, 987 S.W.2d 90, 97 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

The Texas supreme court has held that employers in Texas owe certain continuous, non-delegable duties to their employees. *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 754 (Tex. 1975), *abrogated on other grounds by Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex. 1978); *see also Kroger Co. v. Milanes*,

13

474 S.W.3d 321, 335 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Included among these are the duties to (1) furnish a reasonably safe workplace; (2) warn employees of hazards of their employment that are not commonly known or already appreciated; (3) supervise employees' activities; (4) hire competent co-employees; (5) furnish reasonably safe instrumentalities with which to work; and (6) provide safety regulations. *Kroger Co.*, 474 S.W.3d at 335 (citing *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 652 & n.10 (Tex. 2007); *Farley*, 529 S.W.2d at 754). An employer also has the duty to train employees in "the safe use and handling of products and equipment used in and around an employer's premises or facilities." *Id.* An employer has the duty to use ordinary care, based on standard negligence principles, in carrying out these duties. *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996); *Kroger Co.*, 474 S.W.3d at 335.

However, a corporation generally is not liable for the negligence of someone who is not its employee. *Serv. Corp. Int'l*, 348 S.W.3d at 228; *Ross Stores, Inc.*, 612 S.W.3d at 688. Accordingly, to warrant the imposition of these duties, the record must contain legally sufficient evidence to support a finding of an employment relationship between Diamond Drilling and the actors involved in this incident. *See, e.g.*, *Serv. Corp. Int'l*, 348 S.W.3d at 229-31; *Ross Stores, Inc.*, 612 S.W.3d at 688-90.

Evidence is legally insufficient when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Serv. Corp. Int'l*, 348 S.W.3d at 228 (internal quotation omitted). Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in

their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). If, however, the evidence does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess, then it is no evidence. *Id.*

### 2. Relevant Evidence

The jury heard testimony from Daryl Tankersley, who was working as a safety department representative and medic on the Ocean Valiant at the time of Black's injury. Tankersley previously had been deposed as the corporate representative for the Diamond entities involved in the suit, including Diamond Drilling.

According to Tankersley, he was working for Diamond Offshore Services Limited at the time of Black's injury. Discussing the Diamond entities' corporate structure, Tankersley agreed that he worked for Diamond Drilling "at least in some capacity."

Tankersley testified generally about Diamond Drilling's involvement with the Ocean Valiant and the activities conducted thereon. Tankersley reviewed the ship's daily drilling report for January 2, 2015, the date of Black's injury. The report states that Diamond Drilling is the "contractor" and does not include any other "contractors." Black is listed as an employee on the daily drilling report; the report states that Black was not injured on this "tour." Tankersley agreed that this statement was "false."

Tankersley also reviewed a daily drilling report dated one week before Black's injury. This daily drilling report also lists Diamond Drilling as the ship's sole "contractor." Tankersley agreed that he had not seen "any documents to suggest that there were any other Diamond Offshore entities located on the Ocean

15

Valiant on January 2, 2015[,] other than Diamond Offshore Drilling, Incorporated."

Finally, Tankersley reviewed the "Injury/Illness Incident" report completed on the day of Black's injury. The report lists "Diamond Offshore" as the "Client." The "Supervisor" listed on the report has a Diamond Drilling email address.

Describing the duties he performed as the Ocean Valiant's safety department representative, Tankersley said he did "lots of deck surveys" and "work[ed] with the shipyard personnel, verifying that they were following our policies and procedures." Tankersley agreed that he was responsible for "housekeeping" and "want[ed] to make sure that everything is put up and properly stored." Tankersley testified that the ship's hazardous chemical storage was undergoing work so "most of those chemicals were removed" and some chemicals "were kept at the point of use in an authorized area, personnel only area." When asked whether the ship's crew was informed that certain hazardous chemicals would be moved from their usual storage area, Tankersley said it "would have probably been just discussed in meetings" but he did not "recall the specifics."

One of the hazardous chemicals moved from its usual storage area was the AlfaNeutra bucket Black sat on while working. Tankersley agreed that the AlfaNeutra "was being improperly stored at the time" of Black's injury.

Tankersley treated Black shortly after his injury. Tankersley said Black was transported to a local hospital "an hour or so after the initial incident." According to Tankersley, Black returned to the ship with a release to work. Black returned to his regular duties and Tankersley assisted him with changing his bandages and applying wound cream per doctor's orders.

Tankersley also was involved in the investigation of the incident.

16

Tankersley said the investigation was "never able to determine who was the one — who actually was the last one to use" the AlfaNeutra bucket that Black sat on. Tankersley said he "believe[d] that an employee was responsible for not storing the chemicals properly." But Tankersley could not identify which Diamond entity this employee would have worked for. Referring to the Diamond entities' corporate structure, Tankersley said he did not "understand how that works."

The investigation also was assisted by Clyde Reeves, the head of Black's department and to whom Black reported. Tankersley was unsure which Diamond entity Reeves worked for and explained that he "d[id]n't know who gets paid from what area and who works in — for what individual entity." Tankersley agreed that Reeves's email address "is an email address for Diamond Offshore Drilling, Incorporated."

Tankersley reviewed the investigative report created after the incident. According to the report, the "root causes" of the incident were: "improper storage of hazardous chemicals as it pertains to the physical location in proximity of the work area"; "improper storage of hazardous chemicals in relation to adequately securing the cap after use"; and "inadequate hazard identification prior to starting the job due to complacency." Tankersley also said Black was "the area supervisor for that area" and was "responsible for maintaining that area and responsible for knowing what chemicals were in that area and for also understanding having clearly marked containers and the contents thereof."

During this line of inquiry, a portion of Tankersley's previously recorded deposition was played into evidence. Tankersley was asked, "So it's not uncommon for a mechanic to sit on a bucket or some other piece of equipment in order to access the equipment they're working on?" Tankersley responded, "Correct."

17

Tankersley said that, during his investigation of the incident, he did not see any connections to Diamond Bermuda. Tankersley said he did not maintain a "strong line of contact" with anyone in Bermuda nor had he ever been to Bermuda. Tankersley did not know if Diamond Drilling maintained an office in Bermuda. Tankersley agreed that he maintained "a strong line of contact" with Diamond's corporate headquarters in Houston.

Tankersley said Diamond Bermuda would not have had any control over how hazardous chemicals would be stored on the Ocean Valiant. Tankersley said this would be managed "by the rig."

The jury also heard from Karen Roll, a senior human resources business partner at "Diamond Offshore." According to Roll, part of her job included hiring and firing employees. Roll said she had spent 23 years working for Diamond Offshore in its Houston office. Roll agreed that this location is listed online as Diamond Drilling's Houston headquarters. Roll said she had never been to Bermuda nor had she made contact with anyone from Diamond Bermuda's office.

Roll reviewed the employment contract Black signed in 2008 with Diamond Bermuda. Roll agreed that she signed the employment contract in her capacity as Diamond Drilling's "representative." Roll further agreed that the paperwork for Black's hiring was completed in the Houston office.

Roll also reviewed two of Black's training certificates, both of which state the training was completed with "Diamond Offshore Drilling, Inc." The first certificate is for "Safety Leadership" and was completed in July 2009. The second certificate is for "Manual Handling" and was completed in May 2014. Roll agreed that Diamond Drilling "trained Mr. Black kind of throughout his career with Diamond, based off these documents." Roll said she had not seen any documents suggesting Black was trained in Bermuda.

18

Roll also emailed Black regarding his termination in July 2015. Roll's email to Black instructed him to direct any questions to a separate employee with a Diamond Drilling email address. Roll's signature line on the email stated that she was a Diamond Drilling employee.

According to Black's testimony, he started working with the Diamond entities in 2008. During the hiring process, Black said his point of contact was Roll in the Houston office. Black testified that, at the time of the incident, his immediate supervisor was Reeves, an employee of Diamond Drilling. Black said he took his work orders from Reeves and, on the day of the incident, Reeves assigned Black to work on the water maker. According to Black, the water maker is a piece of equipment that "convert[s] seawater to drinking water and fresh water." Black said the water maker was located in the ship's auxiliary machine room.

Turning to the day of the incident, Black said he was not told there would be hazardous chemicals in the auxiliary machine room. Black also said he was not told to look for hazardous chemicals nor did he expect any to be located in the auxiliary machine room. According to Black, "[t]here actually shouldn't have been any hazardous chemicals in that area. It's not an area where they should be stored."

Further describing his work on the water maker, Black said "the parts that [he] was working on were actually down really low, below knee level." Black said that, as part of his training with Diamond Drilling, he learned about safe posture and lifting techniques. Black said the AlfaNeutra bucket was located "right behind" him so he "just sat down" on it. Black recalled that he sat on the bucket for about 10-15 minutes before he felt the AlfaNeutra soaking through his coveralls.

19

Black said Tankersley treated his injury before he was transported off the ship. Black then was taken to a "local clinic" where he "had to wait for quite a bit" before he was seen by a doctor. Black said his burn was treated with cream and a dressing was applied. Black returned to the ship and went back to work the same day. Black continued to work over the next several days as his pain worsened.

Black said the pain became "unbearable" and he returned to the ship's medic. The medic offered to take Black back to the "local clinic" but Black "wanted to go and see someone that knew something about burns to get it looked at and treated properly." Black returned to the United Kingdom and saw his local doctor, who diagnosed Black's injury as a third-degree chemical burn. Black underwent an immediate skin graft surgery and remained in the hospital for a week.

Turning to his relationship with Diamond Bermuda, Black said he had never been to Bermuda, never spoken with anyone in Bermuda, nor received any training in Bermuda. Black said he had only traveled to Houston for training.

Finally, Appellants called David Ellingburg to testify as a corporate representative. Ellingburg said the purpose of Diamond Drilling is to own various subsidiaries of Diamond Offshore. Ellingburg said Diamond Drilling has no employees.

Ellingburg explained that one of Diamond Drilling's subsidiaries is Diamond Bermuda. Ellingburg described Diamond Bermuda as an "employment subsidiary" that employs "third country nationals" like Black. According to Ellingburg, the United States citizens working on the Ocean Valiant were

employed by a separate subsidiary: Diamond Offshore Services Limited.[5]

### 3. Application

Here, the record contains evidence sufficient to support the trial court's implied finding that an employment relationship existed between Diamond Drilling and the actors involved in this incident. Specifically, the evidence summarized above shows:

- Roll signed Black's 2008 employment contract in her capacity as a Diamond Drilling representative.

- Black completed safety leadership and manual handling training with Diamond Drilling in Houston.

- During his Diamond employment, Black had not visited or spoken with anyone in Bermuda. Black traveled only to Houston for training.

- On the daily drilling reports completed a week before and on the day of the incident, Diamond Drilling was listed as the Ocean Valiant's "contractor," and the daily drilling reports did not list any other contractors.

- Tankersley was employed at least in some capacity for Diamond Drilling. At the time of the incident, Tankersley worked on the Ocean Valiant as a safety department representative and medic.

- Tankersley performed "housekeeping" duties on the ship, which included "mak[ing] sure that everything is put up and properly stored."

---

[5] During the charge conference, the parties and the trial court had a lengthy discussion about Diamond Offshore Services Limited. According to Black's counsel, Black was first informed of this subsidiary's existence during Ellingburg's testimony. Pointing to Appellants' responses to requests for disclosure and interrogatories, Black's counsel asserted that Appellants did not disclose this entity's existence as a potential party or an entity that "caused or contributed" to the incident in any way.

In its ruling on this objection, the trial court included in the jury charge a paragraph stating that, "Diamond Offshore Services Limited and Diamond Offshore Drilling (Bermuda) are subsidiaries of Diamond Offshore Drilling Incorporated." Black's counsel emphasized this instruction in his closing argument and stated that Diamond Bermuda and Diamond Offshore Services Limited "are to be held responsible as any subsidiaries" of Diamond Drilling.

- Tankersley was aware that some hazardous chemicals were removed from their usual storage area on the Ocean Valiant, including the bucket of AlfaNeutra Black sat on.

- On the day of his injury, Black said he was not told to look for any hazardous chemicals in his workplace nor did he expect any to be located in the auxiliary machine room.

- Tankersley provided care to Black immediately after his injury and before he was transported off the ship.

- Tankersley was involved in the investigation of Black's injury and concluded that an employee on the ship was responsible for the improper storage of the AlfaNeutra. According to Tankersley, the investigation was not able to identify who this employee was or which Diamond entity the employee worked for.

- Clyde Reeves, Black's supervisor, also participated in the investigation. Reeves had a Diamond Drilling email address and Black testified that Reeves worked for Diamond Drilling. Reeves instructed Black to work on the water maker on the day of the incident.

- During the incident's investigation, no connections were made to Diamond Bermuda.

- The supervisor listed on Black's injury report had a Diamond Drilling email address.

- When Roll subsequently emailed Black regarding his termination, Roll directed Black to contact a Diamond Drilling employee with any questions he had about benefits. Roll's signature line on this email also identified her as a Diamond Drilling employee.

Considered together, this evidence shows that Diamond Drilling assumed responsibility as the contractor for the Ocean Valiant and employed, at least in some capacity, the crew members. Various crew members were involved in all pertinent aspects of the incident, including: (1) ensuring housekeeping policies and procedures were followed on the ship, (2) failing to ensure those procedures were followed with respect to the AlfaNeutra bucket Black sat on, (3) instructing Black to work on the water maker, (4) treating Black's injury, and (5) investigating

22

the incident. More broadly, the evidence shows Diamond Drilling representatives participated in Black's hiring, training, and termination. The evidence does not show this level of involvement for any other Diamond entity, including Diamond Bermuda and Diamond Offshore Services Limited. Accordingly, the record contains evidence sufficient to support the trial court's implied finding of an employment relationship as necessary to impose a duty of care upon Diamond Drilling. *See, e.g.*, *Serv. Corp. Int'l*, 348 S.W.3d at 229-31; *Ross Stores, Inc.*, 612 S.W.3d at 688-90.

Challenging this conclusion, Appellants liken the evidence presented here to that deemed insufficient to support the finding of an employment relationship in *Service Corporation International*, 348 S.W.3d at 229-31, and *Ross Stores, Inc.*, 612 S.W.3d at 688-90.

But in those cases, the evidence tying the parent corporation to the relevant facts and actors underlying the negligence claim were slight compared to the evidence in the present case. *See Serv. Corp. Int'l*, 348 S.W.3d at 229-31 (evidence included statements from workers that they worked for "SCI" and the "SCI" logo printed on personnel paperwork, both of which were consistent with employment with either the parent or subsidiary corporation); *Ross Stores, Inc.*, 612 S.W.3d at 688-90 (evidence included manager's statement that all subsidiary employees also were employees of the parent corporation; bottom of each page of employee handbook had a footer stating, "[parent corporation's] HR Policy Handbook"; and a statement in a letter to the plaintiff stating that "We at [parent corporation] are sorry to hear you were injured at work."). Here, the relevant evidence rises well above the level of that examined in *Service Corporation International* and *Ross Stores, Inc.* Accordingly, these cases do not control our analysis.

Further, this evidence also is legally sufficient to support the jury's finding that Diamond Drilling breached its duties to Black. As set out above, employers in Texas owe certain duties to their employees and are required to use ordinary care in carrying out these duties. *See Farley*, 529 S.W.2d at 754; *Kroger Co.*, 474 S.W.3d at 335. The evidence is legally sufficient to show that Diamond Drilling breached certain duties, including the duties to (1) furnish a reasonably safe workplace, (2) warn employees of hazards of their employment that are not commonly known or already appreciated, (3) supervise employees' activities, (4) hire competent co-employees, and (5) furnish reasonably safe instrumentalities with which to work. *See Kroger Co.*, 474 S.W.3d at 335.

Therefore, we overrule Appellants' evidentiary sufficiency challenges with respect to Diamond Drilling.

### C. Evidentiary Basis: Diamond Rig

Appellants also contend that "[t]his record provides no basis for a duty running from Diamond Rig to Black or a determination that Diamond Rig breached any such duty." In response, Black asserts that "Diamond Rig owed duties to Black as the owner of the vessel on which his injuries occurred."

Black's argument is premised on the doctrine of unseaworthiness, which provides a cause of action for injuries resulting from defects or insufficiencies of a vessel, its crew, or its appurtenances that undermine the vessel's seaworthiness. *See Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 227 (Tex. App.—Texarkana 2008, pet. denied); *see also Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) ("A shipowner has an absolute nondelegable duty to provide a seaworthy vessel."). A claim for unseaworthiness arises under general federal maritime law. *See Delome v. Union Barge Line Co.*, 444 F.2d 225, 228 (5th Cir. 1971) ("the shipowner's warranty of seaworthiness in personal injury cases is now firmly

24

rooted in federal maritime law"); *see also Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 163 (Tex. 2012) ("[t]he unseaworthiness claim . . . arise[s] under general maritime law"); *Nazareth v. McDermott Int'l, Inc.*, 569 S.W.3d 205, 207 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Under general maritime law, a seaman injured aboard a vessel may assert a claim for unseaworthiness against the vessel owner.").

But as with the Jones Act, certain foreign seamen are excluded from asserting claims under general maritime law. *See* 46 U.S.C.A. § 30105(b); *see also Nazareth*, 569 S.W.3d at 207 ("Section 30105, however, excludes certain foreign seamen from asserting claims under either general maritime law or the Jones Act."). Specifically, section 30105(b) provides that a civil lawsuit for personal injury damages may not be brought under the Jones Act or other federal maritime law if three conditions are satisfied:

(1)    the individual suffering the injury or death was not a citizen or permanent resident alien of the United States at the time of the incident giving rise to the action;

(2)    the incident occurred in the territorial waters or waters overlaying the continental shelf of a country other than the United States; and

(3)    the individual suffering the injury or death was employed at the time of the incident by a person engaged in the exploration, development, or production of offshore mineral or energy resources, including drilling, mapping, surveying, diving, pipelaying, maintaining, repairing, constructing, or transporting supplies, equipment, or personnel, but not including transporting those resources by a vessel constructed or adapted primarily to carry oil in bulk in the cargo spaces.

46 U.S.C.A. § 30105(b).

Section 30105(c) creates two exceptions to this exclusion and provides that a seaman may bring a civil action under general maritime law if he "establishes that a remedy is not available under the laws of either":

(1) the country asserting jurisdiction over the area in which the incident occurred; or

(2) the country in which the individual suffering the injury or death maintained citizenship or residency at the time of the incident.

*Id*. § 30105(c). The burden is on the plaintiff to establish that either of section 30105(c)'s exceptions apply. *See Johnson v. PPI Tech. Servs., L.P.*, 613 F. App'x 309, 312 (5th Cir. 2015).

The record here conclusively establishes that section 30105(b) precludes Black from pursuing a claim under general maritime law: Black was not a citizen or permanent resident alien of the United States when the incident occurred; the incident occurred in the territorial waters of a country other than the United States; and Black was employed at the time of the incident by a company engaged in the production of offshore energy resources. *See* 46 U.S.C.A. § 30105(b). Moreover, these same facts were relied upon by Appellants in their oral motion for a directed verdict on Black's Jones Act claim, which the trial court granted. Black does not challenge this ruling on appeal.

Black does not argue and the record does not show that Black meets either exception listed in section 30105(c). *See id*. § 30105(c); *see also Johnson*, 613 F. App'x at 312. Moreover, the record supports the conclusion that Black had a remedy available under the laws of the country in which he maintained citizenship, as evidenced by his untimely attempt to apply English law to the substantive legal issues in the case. *See also Lawrenson v. Glob. Marine, Inc.*, 869 S.W.2d 519, 526 (Tex. App.—Texarkana 1993, writ denied) (the plaintiff could not pursue a claim under general maritime law "when he has a remedy in England").

Accordingly, section 30105(b) precludes Black from pursuing a cause of action under general federal maritime law. *See* 46 U.S.C.A. § 30105(b). Therefore, Black cannot rely on the doctrine of unseaworthiness to establish a duty

26

owed to him by Diamond Rig. *See Weeks Marine, Inc.*, 371 S.W.3d at 163; *Nazareth*, 569 S.W.3d at 207; *see also Cepeda v. Orion Marine Constr., Inc.*, 499 S.W.3d 579, 584 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("To recover for unseaworthiness, [the plaintiff] must prove that the unseaworthy condition of the vessel proximately caused his injuries. ***But an unseaworthiness claim is not a negligence claim***.") (emphasis added).

Rather, as noted above, Black's "Notice of Intent to Rely on Foreign Law" was not timely filed; therefore, Black only may rely on Texas law to establish a cognizable legal basis for liability with respect to Diamond Rig. *See* Tex. R. Evid. 203; *Cal Dive Offshore Contractors Inc.*, 478 S.W.3d at 921; *PennWell Corp.*, 123 S.W.3d at 764. Under Texas law, the existence of a duty is a question of law for the court to decide from facts surrounding the incident. *See Gator Gone Safety Pilots*, 622 S.W.3d at 536; *Finley*, 246 S.W.3d at 187.

Unlike our analysis with respect to Diamond Drilling, the evidence in the record does not support the conclusion that Diamond Rig had an employment relationship as necessary to impose a duty of care. Aside from owning the Ocean Valiant, Diamond Rig did not have any connection to Black or to the relevant facts or actors underlying the incident.

The record shows only that Diamond Rig owned the Ocean Valiant at the time of Black's incident. At most, this relationship would support a claim sounding in premises liability. *See Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016) ("Under premises-liability principles, a property owner generally owes those invited onto property a duty to make the premises safe or to warn of dangerous conditions as reasonably prudent under the circumstances."); *see also Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 215-17 (Tex. 2015) (delineating the differences between a claim sounding in premises

27

liability and a claim for the violation of a duty arising from an employer-employee relationship). But the theory of recovery submitted to the jury did not reflect a premises liability claim and cannot support a recovery under this theory. *See United Scaffolding, Inc.*, 537 S.W.3d at 480-81. Moreover, Black did not argue in the trial court or on appeal that his claim against Diamond Rig sounded in premises liability.

Accordingly, we agree with Appellants that the trial court erred by impliedly finding Diamond Rig owed a duty to Black. We sustain Appellants' second issue in part with respect to Diamond Rig.

## III. Disposition

A single apportionment question was submitted to the jury, to which it responded as follows:

> What percentage of the negligence that caused the occurrence or injury do you find to be attributable to each of those found by you to have been negligent?
>
> Answer:
>
> | | |
> |---|---|
> | Diamond Offshore Drilling Inc. | 52% |
> | Diamond Rig Investments Limited | 28% |
> | William Black | 20% |
> | Total | 100% |

As explained above, a sufficient evidentiary basis supports the findings that Diamond Drilling owed a duty to Black and that the duty was breached. However, we also conclude that the trial court lacked a sufficient evidentiary basis to conclude that Diamond Rig owed a duty to Black under principles of Texas common law negligence. Accordingly, the jury should not have been permitted to consider Diamond Rig's liability in assigning percentages of responsibility.

28

An analogous situation was examined in *Heritage Housing Development, Inc. v. Carr*, 199 S.W.3d 560 (Tex. App.—Houston [1st Dist.] 2006, no pet.). There, the plaintiff sued a nursing home and its parent corporation for negligent care and treatment of her husband. *Id.* at 562-63. The jury returned a verdict for the plaintiff, finding that the nursing home was liable for 40% of the damages and the parent corporation was liable for 45% of the damages. *Id.* at 564.

On appeal, the court reversed the judgment against the parent corporation, concluding that there was legally insufficient evidence to support vicarious liability against the entity. *Id.* at 570. The court remanded the case and held that, "[i]f the jury's apportionment of liability could have been affected by an issue on which the trial court charged the jury but on which there was legally insufficient evidence, a new trial on the entire negligence claim is required." *Id.* (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 230-31 (Tex. 2005)). Continuing on, the court reasoned:

> [A] new trial is necessary in this case, because the jury reasonably could have apportioned liability differently as between [the nursing home] and the remaining defendants if [the parent corporation] had not been included in the negligence charge. . . . The finding of vicarious liability against [the parent corporation] was not supported by legally sufficient evidence, and we are not reasonably certain that [the parent corporation's] inclusion in the jury charge did not affect the jury's apportionment of liability or the finding of damages against [the nursing home], particularly given [the parent corporation's] contention on appeal that the reason it is not the nursing home employer is because [the nursing home] fits that role.

*Id.* at 571.

We find this reasoning persuasive. Here too, the jury foreseeably could have apportioned liability differently between Diamond Drilling and Black had Diamond Rig not been erroneously included in the apportionment question. *See id.*

Accordingly, we remand the case for a new trial on the negligence claim against Diamond Drilling.

Arguing against this disposition, Black contends that Appellants were required to have made a contemporaneous objection to the apportionment question to preserve their argument that a new trial is required. Black cites *Emerson Electric Co. v. Johnson*, 627 S.W.3d 197 (Tex. 2021), to support this contention.

In *Emerson Electric Co.*, the jury found the defendant liable based on a design defect and a marketing defect. *Id*. at 203. The court upheld the design defect finding and declined to address the defendant's challenges to the marketing defect finding because that theory of liability would not have resulted in any greater relief. *Id*. at 210. The defendant argued that the court should address both liability theories because the jury was asked only one apportionment question and its allocation of responsibility might have been different based on the type of liability it found. *Id*. The court did not address the substance of this argument, noting instead that the defendant "never made the trial court timely and plainly aware of any *Casteel*-type error in the apportionment question." *Id*.

We are not persuaded either by Black's argument or by his reliance on *Emerson Electric Co*. A *Casteel*-type error occurs when the trial court submits a single broad-form liability question incorporating multiple theories of liability and the appellate court cannot determine whether the jury based its verdict on an invalid theory that was improperly submitted. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000); *see also Zaidi v. Shah*, 502 S.W.3d 434, 440 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("*Casteel* and its progeny are intended to remedy the trial court's error in failing to eliminate — or at least segregate — the factfinder's consideration of invalid claims."). *Casteel*-type errors must be preserved in the trial court by a timely and specific objection. *See Tex.*

*Comm'n on Human Rights v. Morrison*, 381 S.W.3d 533, 536 (Tex. 2012) (per curiam).

Here, the apportionment question did not commingle multiple theories of liability. Rather, the apportionment question asked the jury to segregate liability amongst three separate parties: Diamond Drilling, Diamond Rig, and Black. On appeal, we conclude there was an insufficient evidentiary basis to warrant the imposition of liability against Diamond Rig, an entity the jury found 28% responsible for the underlying incident.

Accordingly, this issue cannot be characterized as a *Casteel*-error because we are not presented with a question as to whether the jury's verdict was based on an invalid theory. Instead, we have already concluded the verdict was based on one (and only one) valid theory of liability, *i.e.*, general negligence. Because the jury foreseeably could have apportioned liability differently had Diamond Rig not been included in the charge, a new trial is warranted. *See Heritage Hous. Dev., Inc.*, 199 S.W.3d at 571.

## CONCLUSION

In sum, we conclude that Question No. 1 did not submit an immaterial claim that cannot support Black's recovery. We overrule Appellants' first issue.

We overrule in part and sustain in part Appellants' second issue, conclude a sufficient legal and evidentiary basis supports the imposition of liability against Diamond Drilling, and conclude insufficient evidence supports the trial court's implied finding that Diamond Rig owed a duty to Black.

We therefore reverse the judgment against Diamond Rig and render judgment in its favor. Because the jury apportioned liability among Diamond Rig and Diamond Drilling, we cannot be reasonably certain that the inclusion of

31

Diamond Rig in the charge did not affect the jury's findings as to the apportionment of liability. We therefore remand the case for a new trial as to Diamond Drilling.

We need not address Appellants' third issue in light of our disposition of Appellants' second issue.


/s/     Meagan Hassan
             Justice


Panel consists of Justices Jewell, Zimmerer, and Hassan (Jewell, J., concurring).