# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 27, 2023

Lyle W. Cayce
Clerk

No. 22-10295

Joshua Amin,

*Plaintiff—Appellant*,

*versus*

United Parcel Service, Incorporated, a Delaware corporation,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-2578

Before Higginbotham, Jones, and Oldham, *Circuit Judges*.

Per Curiam:

Joshua Amin alleges that he was denied a bathroom break by his supervisor at a Dallas, Texas warehouse until he was forced to defecate on himself at his workstation. Amin sued his employer, UPS, for negligent supervision, invasion of privacy, and intentional infliction of emotional distress (IIED). The district court dismissed the first two claims under Fed. R. Civ. P. 12(b)(6) and granted UPS's motion for summary judgment on the third. Amin timely appealed. The district court correctly held that Amin has not met the standard for IIED claims. However, it erred in concluding that

No. 22-10295

Amin's negligent supervision claim was preempted by federal law. Based on our *Erie* guess, we also disagree with the district court's conclusion that the alleged facts do not constitute an invasion of privacy. Therefore, we AFFIRM IN PART and REVERSE IN PART.

## BACKGROUND

According to his pleadings, Amin was a package sorter for UPS in a Dallas warehouse. A collective bargaining agreement (CBA) between UPS and the International Brotherhood of Teamsters Local Union #767 governed the terms of his employment. Among other things, the agreement protects workers from abusive management practices and provides a grievance process in case of violation.

The alleged incident took place on December 6, 2018. Amin left his workstation to use the restroom. A part-time supervisor had approved the break. On the way, he ran into UPS division manager Sergio Castro. Castro asked Amin where he was going; Amin explained that he needed to use the restroom. Castro told Amin that he had already had his ten-minute break earlier that day and he should get back to work. Amin replied that he was sick, was on antibiotics, and needed to use the restroom immediately. Castro threatened to "walk [Amin] out right now" if Amin did not return to work.

Amin eventually complied. Castro followed him to his workstation and taunted him, saying, "I guess if you got to go and you use your 10 minutes, from now on you can use [the restroom] right here, where you are." Shortly after, that is exactly what transpired. Castro then yelled out that if Amin's coworkers needed to use the restroom outside of their ten-minute break, they could relieve themselves at their station, "just like Josh." Castro forced Amin to work in soiled pants for another twenty minutes.

The next day, Castro gave Amin a written warning for Amin's "insubordination," a notice of UPS's intent to suspend Amin, and a notice

2

No. 22-10295

of UPS's intent to discharge him.  Nothing seems to have come of these notices.  Amin continued to work at UPS for several months, until he and another employee were fired for getting into a physical altercation.  However, Amin alleges that the other employee was reinstated with full back pay, while Amin's termination was the result of unfair representation on the part of the union.

The same day that Amin received the written notices from Castro, Amin filed a grievance with the union asking that the notices be withdrawn and that Castro apologize for the December 6 incident.  Months after Amin was fired, the union and UPS reached a settlement of the grievance on these terms: "UPS does not admit any contract violation but assures the Union and Mr. Amin that the company will comply with Articles 37 and 66 of the CBA in all respects.  This matter is resolved without precedent."  Amin was not involved in the settlement process and received no compensation as a result of the agreement.

Having failed to secure any relief from the grievance process, Amin filed a federal diversity action alleging (1) false imprisonment, (2) invasion of privacy, (3) intentional infliction of emotional distress (IIED), and (4) negligent supervision.  The district court dismissed counts (1), (2), and (4) under Fed. Rule Civ. P. 12(b)(6).  It held that Amin had failed to state a claim on the first two counts, and that his fourth claim was preempted by the Labor Management Relations Act (LMRA).  Later, the district court granted UPS's motion for summary judgment on Amin's IIED claim.  Amin appeals all but the dismissal of the false imprisonment claim.

No. 22-10295

## DISCUSSION

This court reviews Rule 12(b)(6) dismissals and summary judgments *de novo. GWTP Invs., L.P. v. SES Americom, Inc.*, 497 F.3d 478, 481 (5th Cir. 2007). When reviewing dismissals on the pleadings, we assume that the plaintiff's factual allegations are true and must dismiss if they fail to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007), or fail "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S. Ct. 1827, 1832 (1989). The district court granted summary judgment on the IIED claim, which must be affirmed where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

### A. Intentional Infliction of Emotional Distress

The elements of the tort for intentional infliction of distress are: "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress that the plaintiff suffered was severe." *City of Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex. 2000). Only the fourth element is disputed here.

To show severe emotional distress, plaintiffs "must bring forth clear and specific evidence that they suffered distress so severe that no reasonable person could be expected to endure it." *Cunningham v. Waymire*, 612 S.W.3d 47, 65 (Tex. App.—Houston [14th Dist.] 2019). Courts ground this inquiry in factors such as the "intensity and duration of the distress," *Toles v. Toles*, 45 S.W.3d 252, 263 (Tex. App.—Dallas 2001), as well as whether the plaintiff sought treatment, *Higginbotham v. Allwaste, Inc.*, 889 S.W.2d 411, 417 (Tex. App.—Houston [14th Dist.] 1994). "Mere worry,

anxiety, vexation, embarrassment, or anger are not enough" to prevail. *Cunningham*, 612 S.W.3d at 65.

On appeal, Amin gives two reasons to find that his emotional distress was severe. He contends that the humiliating nature of the December 6 incident itself supports a finding of severe distress, and he argues that the testimony offered by his friends and himself establishes the severity of the distress.

Disgusting though it was, the December 6 incident is alone insufficient under Texas law to satisfy a finding of severe emotional distress. There must be "sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part." *Tidelands Auto. Club v. Walters*, 699 S.W.2d 939, 944 (Tex. App.—Beaumont 1985); *Munoz v. H & M Wholesale, Inc.*, 926 F. Supp. 596, 612 (S.D. Tex. 1996). While the shocking nature of a defendant's conduct can be "important evidence" as a cause of severe distress, it cannot solely carry the day. *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 343 (Tex. App. 1991). The incident itself does not do double duty for the impact on the plaintiff.

Additionally, Amin has not presented independently sufficient evidence that his emotional distress is "severe" for the purposes of the IIED tort.[1] Two friends characterized him as "depressed" and "withdrawn" after the incident. One even advised him to seek professional help. Both say that Amin has reduced his interactions with them because of what happened. For

---

[1] Amin also argues that the question whether his emotional distress is "severe" must be left to a jury under the Seventh Amendment. As with any factual issue subject to Rule 56, federal courts can and have found that certain allegations do not constitute severe emotional distress as a matter of law. *See, e.g., Peavy v. Harman*, 37 F. Supp. 2d 495, 523 (N.D. Tex. 1998), *aff'd in part and rev'd in part on other grounds*, 221 F.3d 158 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 2191 (2001).

his part, Amin attests that he thinks about the incident every day. He also stated that he stays away from crowded places when he is with his son to avoid encountering someone who knows about the incident and might mention it in front of his son. But an IIED claim rests not only on extraordinary misconduct but also an extraordinarily damaging impact on a plaintiff. Thus, testimony that a plaintiff is "withdrawn and no longer happy" does not sustain an IIED claim. *Union Pac. R.R. Co. v. Loa*, 153 S.W.3d 162, 171 (Tex. App.—El Paso 2004). Likewise, "feelings of anger, depression, and humiliation (even when embarrassed in front of children), are insufficient evidence of severe distress." *Villasenor v. Villasenor*, 911 S.W.2d 411, 417 (Tex. App.—San Antonio 1995). Although Amin was advised to seek counseling, he notably never did so. In sum, Amin's proof does not meet the test for the infliction of severe distress under Texas law.

Cases in which Texas courts *have* found severe emotional distress provide a useful counterpoint. Amin does not claim to have suffered severe psychosomatic symptoms,[2] suicidal ideation,[3] a marked degradation in physical appearance,[4] or post-traumatic stress disorder.[5] In the absence of these or similarly extreme facts, the district court correctly concluded that Amin's distress is not "so severe that no reasonable person could be expected to endure it." *Cunningham*, 612 S.W.3d at 65. Amin's evidence

---

[2] *Tidelands*, 699 S.W.2d at 945 ("[The plaintiff] became very ill and very disoriented" and had to seek medical attention.).

[3] *Am. Med. Int'l*, 821 S.W.2d at 342-343 ("[The plaintiff] asks himself everyday if it is worth going on living.").

[4] *Id.* at 343 ("[The plaintiff] looked older, grayer and thinner than he had before."); *Behringer v. Behringer*, 884 S.W.2d 839, 845 (Tex. App.—Fort Worth 1994) ("[The plaintiff] was much thinner than he had been.").

[5] *Haryanto v. Saeed*, 860 S.W.2d 913, 922 (Tex. App.—Houston [14th Dist.] 1993).

does not create a genuine, triable issue of material fact that could support an IIED tort under Texas law.

## B. LMRA Preemption

On the other hand, the Labor Management Relations Act does not preempt Amin's state-law based negligent supervision claim. Section 301(a) of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C. § 185(a), provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

This language "governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394, 107 S. Ct. 2425, 2431 (1987) (internal quotation marks omitted). Therefore, state law claims that are "inextricably intertwined" with a CBA are preempted by the LMRA. *Jones v. Roadway Exp., Inc.*, 931 F.2d 1086, 1089 (5th Cir. 1991).

To determine whether a plaintiff's state law claim is "inextricably intertwined" with the CBA, *id.*, the Supreme Court has "underscored" that § 301 may not be read to cover all cases where "a collective-bargaining agreement will be consulted" in the course of litigation. *Livadas v. Bradshaw*, 512 U.S. 107, 124, 114 S. Ct. 2068, 2078 (1994). In particular, § 301:

> cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law . . . it is the legal character of a claim, as independent of rights under

the collective-bargaining agreement (and not whether a grievance arising from precisely the same set of facts could be pursued) that decides whether a state cause of action may go forward.

*Id.* at 123–24, 2078 (citations and internal quotation marks omitted).

UPS contends that the negligent supervision claim requires Amin to establish what supervision duties were owed in the first place, and this effort necessarily implicates the CBA.[6] We disagree. The state of Texas imposes "continuous, non-delegable duties" on employers to "supervise employees' activities [and] hire competent co-employees." *Kroger Co. v. Milanes*, 474 S.W.3d 321, 335 (Tex. App.—Houston [14th Dist.] 2015). Those duties are "independent" of the obligations established by the CBA and "nonnegotiable." *Livadas*, 512 U.S. at 123–24, 114 S. Ct. at 2078. Regardless of the substance or even existence of a CBA, an employer cannot turn a blind eye when its supervisors commit intentional torts against employees. And UPS has not attempted to explain how, given the alleged facts, the CBA would bear on the state law duties owed here or the existence of a breach of those duties. Thus, it is not even clear that the CBA "will be consulted" during litigation of the claim. *Livadas*, 512 U.S. at 124, 114 S. Ct. at 2078. State law is certainly not inextricably intertwined with the CBA. LMRA preemption is inapplicable.

The duties imposed by Texas law distinguish this case from others where courts have found preemption. For example, the Eleventh Circuit

---

[6] UPS cites a district court opinion to support this proposition. *Alvarez v. United Parcel Serv. Co.*, 398 F. Supp. 2d 543, 553 (N.D. Tex. 2005) ("Any duty to effectively supervise employees, or breach of such duty, is inextricably intertwined with the issue of discipline."). But that case has low persuasive weight, especially because it was decided on an unopposed motion for summary judgment. *Id.* at 548. To the extent that its holding conflicts with this opinion, the district court was in error.

held that § 301 completely preempts negligent supervision claims under Alabama law because Alabama common law does not impose on employers a duty to employees, so the source of any duty for the employer to undertake "must be the CBA." *Palmer v. Loc. 8285 United Steel Workers of Am.*, 234 F. App'x 884, 888 (11th Cir. 2007). Similarly, the Supreme Court held that § 301 preempted a state-law claim for bad-faith handling of a worker's compensation claim when the duties an employer owed the employee, including the duty of good faith, were firmly rooted in the CBA. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213–16, 105 S. Ct. 1904, 1912–14 (1985). In that case, however, the Supreme Court also cautioned "that other state-law rights, those that existed independent of the context, would not similarly be preempted," as is the case here. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260, 114 S. Ct. 2239, 2247–48. (1994) (discussing *Lueck*, 471 U.S. at 211–12, 105 S. Ct. at 1911–12). Employers in Texas owe employees a state law duty to supervise employees. *Kroger*, 474 S.W.3d at 335. Because this duty is independent of any duty imposed by the CBA and does not require interpretation of the CBA, the source of the duty is not grounds for § 301 preemption. *See Hawaiian Airlines*, 512 U.S. at 260, 114 S. Ct. at 2247–48.

The district court held that § 301 preempted Amin's negligent supervision claim because the CBA provides resolution procedures for grievances involving employee-manager relationships, and "any duty to effectively supervise employees, or breach of such duty, is inextricably intertwined with the issues of discipline." However, the Supreme Court has held that the potential of a CBA-based remedy does not deprive an employee of independent state-law remedies. *Id.* For example, in *Lingle v. Norge Div. of Magic Chef, Inc.*, the Supreme Court allowed a state-court action for retaliatory discharge to go forward after an employee filed a grievance pursuant to a CBA provision that protected employees from being discharged

except for just cause. 486 U.S. at 402, 108 S. Ct. at 1879. The CBA in that instance broadly covered all disputes between the employer and employee. *Id.* The Court looked to the elements of the claim, noting that the elements were "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer." *Id.* at 407, 1882. Because none of the elements required evaluating the CBA, the Court held that the state-law claim was independent for § 301 preemption purposes. *Id.*

This case is similar to *Lingle* in that Amin pursued a grievance pursuant to the CBA and the CBA broadly covers all disputes between managers and employees. The elements of a negligent supervision claim, as discussed above, are purely factual questions and do not require any interpretation of the CBA. Like the employee's claim in *Lingle*, Amin's claim can be resolved entirely without referencing the CBA, as the duty to diligently supervise arises from state law, as opposed to the CBA. The duty UPS owed Amin is independent of the discipline procedures set forth in the CBA. Whether UPS followed the discipline procedures is not determinative of whether UPS breached its state law duty to Amin. And CBA disciplinary procedures certainly do not influence whether a breach proximately caused Amin's injury. In conclusion, none of the elements of Amin's claim require interpreting the CBA.

Nevertheless, the fate of Amin's negligent supervision claim is tied to the cognizability of his invasion of privacy claim. Texas courts have held that plaintiffs bringing a negligent supervision claim must "establish not only that the employer was negligent in hiring or supervising the employee, but also that the employee committed an actionable tort against the plaintiff." *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 384 (Tex. App.—Houston [1st Dist.] 2005). Because we have rejected Amin's IIED claim, the only tort that could support this element is invasion of privacy. We turn to that claim.

## C. Invasion of Privacy

Amin's theory for invasion of privacy is that Castro's actions were an "intrusion upon seclusion or solitude or into one's private affairs." "Because no Texas court has ruled on this issue . . . we must make an *Erie* guess." *Am. Guarantee & Liab. Ins. Co. v. ACE Am. Ins. Co.*, 990 F.3d 842, 848 (5th Cir. 2021); *see generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938). The Second Restatement of Torts—which Texas has relied on to establish its common law in this area—seems to indicate liability for the conduct at issue. Therefore, we believe that Texas courts would find Castro's conduct actionable.

There "are two elements to this cause of action: (1) an intentional intrusion, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns, which (2) would be highly offensive to a reasonable person." *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993). Amin claims an intrusion into one's private affairs. The Texas Supreme Court in *Valenzuela* relied on the Second Restatement of Torts, which explains this tort as follows:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself. . . . It may also be by the use of the defendant's senses, with or without mechanical aids, to *oversee or overhear the plaintiff's private affairs,* as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by *some other form of investigation or examination* into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The *intrusion itself* makes the defendant subject to liability, *even though there is no* publication or *other use of* any kind of the photograph or *information* outlined.

Restatement (Second) of Torts § 652B cmt. b (1977) (emphasis added).

Applying this description to specific facts, Texas courts have held that "intrusion upon private affairs" typically requires either a trespass or an attempt to discover or perceive private information. *See Clayton v. Wisener*, 190 S.W.3d 685, 696 (Tex. App.—Tyler 2005) ("The invasion-of-privacy tort is typically associated with either a physical invasion of a person's property or eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying."). UPS asserts that Amin's claim is not actionable because Amin defecated publicly rather than in seclusion, whereas it might have been actionable if "Castro watched, recorded or spied upon Amin in the privacy of a bathroom." In other words, the "secluded" location of the invasion or the victim's thinking that his actions or words are "secluded" is as critical as the invasion itself. That Castro prevented Amin from reaching the seclusion of a bathroom is irrelevant, according to UPS.

But the tort described in the Restatement stands for more than physical or auditory invasions. It encompasses Amin's humiliation as Castro forced him to defecate, a function all civilized humans believe to be manifestly private, in public.

The quoted comment to § 652B makes "the intrusion itself" the basis for liability, "even though there is no publication or other use" of the "information." If there is a tortious invasion of one's private affairs without *any use* of the information so obtained, surely the invasiveness is heightened where deliberate *public use* is made of the information, as alleged here. Exposing a private affair to public view, even without trespass or intent to spy upon another, is an intrusion into private affairs. Castro's forcing Amin to defecate at his workstation is thus tortious conduct.

Another portion of the Restatement lends further support to Amin's position. Illustration 7 of Comment C gives the following example of an invasion of privacy:

No. 22-10295

> A, a young woman, attends a 'Fun House,' a public place of amusement where various tricks are played upon visitors. While she is there a concealed jet of compressed air blows her skirts over her head, and reveals her underwear. B takes a photograph of her in that position. B has invaded A's privacy.

Restatement (Second) of Torts § 652B cmt. c, illust. 7 (1977). The Texas Supreme Court in *Valenzuela* adopted the Restatement without evident narrowing of this provision. 853 S.W.2d at 513. The analogy to Amin's situation is straightforward: like A, Amin was in a public place, and like B, Castro violated his privacy by taking what should have been a private matter and exposing it to public scrutiny.

The importance of personal privacy to Texas's legal framework is also worth noting. The Texas Supreme Court has found that Texas's Constitution guarantees a right to privacy. *Tex. State Emps. Union v. Tex. Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987). And when an unwanted invasion of privacy occurs, the Supreme Court has recognized a common law right of action. *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973). "The right of privacy has been defined as the right of an individual to be left alone, to live a life of seclusion, to be free from unwarranted publicity." *Id.* at 859; *see also Cain v. Hearst Corp.*, 878 S.W.2d 577, 578 (Tex. 1994). This court has recognized that right in a number of contexts, including situations that involve neither trespass nor eavesdropping. *St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.–Tex.*, 249 F.3d 389, 394 (5th Cir. 2001) (finding that constant and abusive debt-collection calls "clearly support a cause of action for invasion of privacy.").

Finally, although cases on point are relatively infrequent, two decisions prove illuminating. In *Hope v. Pelzer*, 536 U.S. 730, 738, 122 S. Ct. 2508, 2514 (2002), the Supreme Court denied qualified immunity to prison officials who violated clearly established law when they handcuffed a prisoner

13

No. 22-10295

to a hitching post for seven hours, leading to "a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation." Thus, the deprivation of bathroom breaks can give rise to constitutional liability against government officers, despite the protection of qualified immunity. Similarly, a West Virginia district court denied qualified immunity to officers who left a woman naked on her floor, refusing to cover her, while eleven men searched her home for up to three quarters of an hour. *Hutchinson v. W.Va. State Police,* 731 F. Supp. 2d 521, 544 (S.D. W. Va. 2010). More pertinent, the court denied summary judgment on her claimed violation of the right to privacy under state law, footed on Restatement (Second) § 652B. *Id.* at 548-49.

Therefore, we conclude that the invasion of privacy tort covers the alleged facts. In recent years, there have been troubling reports of industry practices that deny employees adequate bathroom breaks.[7] It is important to clarify that such actions, or similar examples of public humiliation by exhibition of intimate personal details or actions, are not immune from liability.

## CONCLUSION

For the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART.

---

[7] *See* Michael Sainato, *14-hour Days and No Bathroom Breaks: Amazon's Overworked Delivery Drivers*, GUARDIAN (March 11, 2021), https://www.theguardian.com/technology /2021/mar/11/amazon-delivery-drivers-bathroom-breaks-unions; Audrey Conklin, *Ex-UPS Driver Says Amazon's Pee-in-Water-Bottles Problem Isn't Unique*, FOX BUSINESS (April 1, 2021), https://www.foxbusiness.com/lifestyle/ups-driver-pee-watter-bottles-amazon.